214 F.3d 275 (2nd Cir. 2000)
 DANIEL MONAHAN, EVELYN S. RODRIGUEZ, CECILIA LORDE, LUIS ALMODOVAR, FRED SILVA, THOMAS BASIL, ROBERT NETELL, DANIEL FOYNES, HARVEY BALL, DANIEL APONTE, GARY NARDIELLO, VINCENT REBECCA, ORAL BECKFORD, ALICE BRESLOFF, IRWIN COHEN, JOSE CUEVAS, DENNIS DENIRO, INGRID GRIFFIN, DENNISSE ILARRAZA, THEODORE ISRAEL, SABRINA KEYES-ALSTON, JULIE KNOWLES, TANYA MANN, MICHAEL MESSINA, JOHN MICKEL, NZINGHA MOSES, NOAH NORFLEET, JOSEPH PALERMO, GARFIELD PARKISON, HILDA REYES, KEVIN RILEY, RUBEN RODRIGUEZ, LUIS SANTIAGO, WENDY TYSON, LINDA VARBERO, WILLIE WALLACE, JOHNNY WATFORD, ANTHONY WHITE, DENISE WHYTE-PHILLIPS and MARTINE WHYTE, Plaintiffs-Appellants,
v.
NEW YORK CITY DEPARTMENT OF CORRECTIONS, CITY OF NEW YORK, MICHAEL JACOBSON, Acting Commissioner, City of New York Department of Correction, TERRANCE SKINNER, Deputy Warden and Commanding Officer of the Health Management Division of the City of New York Dept. of Correction, JOHNSTON, Supervisor Civilian (ID NO. 25835), PETER MAHON, former Deputy Warden and Commanding Officer of the Health Management Division of the City of New York Department of Correction, JAMES BIRD, Deputy Warden and Commanding Officer of the Health Management Division of the City of New York Department of Correction
and CAROL L. BISHOP, Assistant Deputy Warden of the City of New York Department of Correction, Defendants-Appellees.
 Docket No. 98-9067
 UNITED STATES COURT OF APPEALS,
FOR THE SECOND CIRCUIT
 Argued March 31, 1999,
Decided June 8, 2000,
 
 1
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 
 
 2
 Fredric Ostrove, Carle Place, N.Y. (Leeds & Morelli, Esqs., Carle Place, New York), for Plaintiffs-Appellants.
 
 
 3
 Susan Choi-Hausman, Office of the Corporation Counsel of the City of New York, New York, N.Y. (Michael D. Hess, Corporation Counsel, Barry P. Schwartz, John Wirenius, Janice Birnbaum of Counsel), for Defendants-Appellees.
 
 
 4
 Before: LEVAL and SACK, Circuit Judges, and MORAN,* Senior District Judge.
 
 
 5
 MORAN, Senior District Judge.
 
 
 6
 Plaintiffs-appellants are current and former New York City correction officers and captains. They appeal from a judgment of the District Court for the Southern District of New York (Rakoff, J.) dismissing with prejudice their consolidated challenge to the sick leave policy of the New York City Department of Correction ("DOC"). Embodied in DOC Directive 2262, the policy permits an eligible officer continuous sick leave for up to one year provided the officer remains at home. Appellants claim the home confinement provision of Directive 2262 is facially violative of the First, Fourth, Fifth and Fourteenth Amendments of the Constitution and has been unconstitutionally applied to individual DOC employees.
 
 
 7
 The district court found that most of plaintiffs' constitutional claims were res judicata based on an earlier lawsuit by the president of the Correction Officers' Benevolent Association ("COBA"), the exclusive bargaining agent for New York City correction officers. The remaining counts were dismissed by the court pursuant to Rule 56 for a failure to aver admissible evidence in support of each claim. On appeal, the officers contend that the prerequisites for res judicata are not present here and, in any event, the district court abused its discretion when it allowed defendants to assert the defense "in the eleventh hour of litigation." Because we conclude that the former suit by COBA president Norman Seabrook barred the subsequent relitigation of plaintiffs' claims and that plaintiffs were not prejudiced by the late assertion of res judicata, we affirm.
 
 BACKGROUND
 
 8
 New York City correction officers regularly confront dangerous and stressful working conditions. Many are injured in the line of duty. Because it is difficult to recruit and retain qualified individuals for these positions, COBA has successfully bargained and secured for its members a generous benefits package, including the "unlimited" sick leave policy at issue here. First implemented in 1987, DOC Directive 2262 generally permits a correction officer to report in sick for periods of up to one year provided he or she stays at home except for authorized medical departures. In 1988, the policy was amended to permit certain officers taking sick leave to be 24 hours out-of-residence so long as certain reporting requirements were fulfilled. Those officers ineligible for the full-day permit were granted a four hour "recreation" period (known as "rec" hours) to attend to their personal needs and were relieved of the obligation to log in and out when leaving home.
 
 
 9
 By 1993, DOC officials suspected that the liberalized sick leave policy was being widely abused. An audit found that much of the documentation submitted by officers for their authorized departures did not substantiate their participation in the reported activity. The audit team recommended that officers on sick leave be limited to their four "rec" hours for all personal activities and that additional hours out-of-residence not be granted. When Terrence Skinner became commanding officer of the Health Management Division ("HMD") in 1995, he implemented many of the auditors' recommendations, tightening up enforcement of Directive 2262 and limiting 24 hour out-of-residence privileges to officers injured in the line of duty. According to the DOC, the new enforcement mechanisms reduced daily sick rates by 35% and allowed the department to more evenly distribute the work load across the uniformed work force.
 
 
 10
 Correction officers subject to the revised policy were not so enthusiastic. On October 13, 1995, COBA President Norman Seabrook and two individual officers filed a civil action in the Eastern District of New York, challenging the constitutionality of Directive 2262's home confinement provisions. See Seabrook v. Jacobson, No. 95 Civ. 4194 (FB) (E.D.N.Y.) (the "Seabrook" action). The complaint, brought by Seabrook "in his capacity as President of the Correction Officers' Benevolent Association," sought compensatory damages for plaintiffs, punitive damages, a declaratory judgment finding Directive 2262 facially unconstitutional, and equitable relief on behalf of "correction officers entitled to sick leave." On April 9, 1996, the Seabrook suit settled, resulting in a "Stipulation and Order of Settlement and Discontinuance" ("stipulation") approved by the district court. The complete text of the stipulation is as follows:
 
 
 11
 WHEREAS, plaintiffs, NORMAN SEABROOK, in his capacity as President of the Correction Officers' Benevolent Association, PATRICIA TAYLOR and BELINDA RUDDER, commenced this action alleging that Section VII of defendants' sick leave policy, Directive 2262, is unconstitutional on its face and as applied, and violated their constitutional rights and the rights of similarly situated sick employees in violation of 42 U.S.C. 1983, and;
 
 
 12
 WHEREAS, defendants assert that the Department of Correction sick leave policy is patently constitutional and justified by a variety of constitutionally sufficient state interests, and deny any and all liability arising out of plaintiffs' allegations; and
 
 
 13
 WHEREAS, the parties now desire to resolve the issues arising from this litigation without further proceedings;
 
 
 14
 IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned as follows:
 
 
 15
 1. The above-referenced action is hereby dismissed, with prejudice, and without costs, expenses and fees;
 
 
 16
 2. Within five days of the Court's signing of this order, defendants agree to amend Section VII of Directive 2262, in the form as annexed hereto as Exhibit "A".
 
 
 17
 3. This Court retains jurisdiction over this action. If the Department of Correction intends to modify Section VII of Directive 2262, 30 days notice of any such change must be provided to the Correction Officers' Benevolent Association ("COBA"), and either party may move to reopen this matter. This paragraph's requirement of notice to COBA expires on January 1, 1998.
 
 
 18
 A fourth paragraph stipulating to the dismissal with prejudice of two related suits[1] was crossed out before the parties signed the stipulation.
 
 
 19
 Pursuant to the parties' agreement, Directive 2262 was amended effective April 22, 1996, consistent with Exhibit A. The Directive now provides that unless officers are classified as "sick leave abusers" they will not be confined to their residence for the first eight days of leave. Beyond this initial grace period, the leave policy differentiates between officers injured in the line of duty and those who are "otherwise out on sick leave." Officers who report sick as the result of a verified line-of-duty injury and who have a definite return-to-duty date within two weeks of the date they visit an HMD physician are not confined to their residences. An officer injured in the line of duty without a definite return date is subject to home confinement, but may apply to HMD for additional time out-of-residence so long as the officer has a sick leave history of 8 days or less per year for 3 years, has not been classified as a "sick leave abuser," has a violation-free sick leave history, and can document an objective finding of injury or illness.[2]
 
 
 20
 Officers otherwise out on sick leave are required to remain in their residences at all times except for "time out-of-residence authorized by HMD." Officers may log out at any time for medical appointments, hospital visits or physical therapy ordered by a physician. All other personal business, however, including civic, educational and religious duties, must be conducted during an officer's daily four-hour block of "rec" time. This is often difficult given that officers must designate either the 8:00 a.m.-12:00 p.m. block or the 1:00-5:00 p.m. block for a thirty day period; there is no evening option. HMD will only entertain individual requests for additional time out-of-residence "in the event of a dire emergency" and each such request is evaluated by the commanding officer of HMD or his designee on a case-by-case basis.
 
 
 21
 All officers subject to the in-residence rules are also subject to home visits by HMD staff between 9:00 a.m. and 10:00 p.m. According to the DOC, the purpose of home visitation is to "ensure compliance with Directive 2262, deter the abuse of sick leave benefits, evaluate medical conditions, and investigate officers suspected of feigning illness." An officer who is not at home when an unannounced visit is conducted may be penalized one month's salary.
 
 
 22
 * * * *
 
 
 23
 This case began with twelve consolidated actions filed in 1996 and 1997 by correction officers and captains subject to Directive 2262. According to the 223-page verified complaint in the Almodovar action, dated October 4, 1996, the home confinement provision of the sick leave policy is unconstitutional, facially and as applied, because it substantially impairs an officer's right to practice his or her religion, to vote, to travel, to freely associate, and to be free from bodily restraint. The following incidents capture the spirit of the hundreds of alleged constitutional deprivations: Michael Messina, injured during an altercation with an inmate, was denied extra time out-of-residence to attend church services, to vote in the Republican primary, and to visit his sister in the hospital; Tanya Mann, who suffered a job-related psychiatric problem, was denied extra time out-of-residence to attend the funerals of six members of her church, to attend Sunday services with her husband, the associate pastor, and to take her daughter to ballet class; Luis Santiago, a veteran, was not permitted to participate in the Memorial Day parade; and Linda Varbero, injured when she slipped in a correction facility locker room, was denied permission to attend a hearing to determine her eligibility for social security. Individual plaintiffs also claim harassment, wrongful punishment, and disparate application of the sick leave policy, and challenge various procedures governing the classification and treatment of "sick leave abusers."
 
 
 24
 Plaintiffs and defendants filed cross-motions for summary judgment in December 1997. Defendants argued, inter alia, that the plaintiffs' claims were barred by res judicata in light of the court-approved stipulation in the Seabrook action; that plaintiffs had not submitted evidence that the policy had been applied unfairly or with an intent to harass; that the individual defendants were entitled to qualified immunity; and that any surviving claims should be transferred to Judge Block, who had approved the Seabrook stipulation. Plaintiffs argued that defendants waived the defense of res judicata when they failed to include it in ten of the twelve answers and filed the remaining two answers in an untimely manner. Even if the defense was allowed, plaintiffs argued, it failed on the merits because the cases involved different plaintiffs, different defendants, different incidents, and a different version of Directive 2262. Finally, plaintiffs asserted that summary judgment was inappropriate on the as-applied claims where there were genuine unresolved issues of material fact.
 
 
 25
 Oral argument was held on the motions on December 23, 1997, and the parties submitted additional memoranda. Defendants responded that they had raised the res judicata defense in the Almodovar and Ball actions, which covered thirty of the forty plaintiffs, and that those answers had been filed with plaintiffs' consent. Defendants also asserted that plaintiffs' counsel was aware of the Seabrook settlement and should therefore be estopped from claiming prejudice. Plaintiffs argued that their consent to the late-filed answers was made without knowledge that they would contain new affirmative defenses. Moreover, the significant time and money expended by plaintiffs on depositions was sufficient to constitute unfair prejudice, they argued, especially where the defendants had failed to present a good cause explanation for the late assertion.
 
 
 26
 Judge Rakoff issued his decision July 7, 1998, granting defendants' motion for summary judgment and dismissing, with prejudice, the entire verified complaint. See Monahan v. City of New York Dep't of Correction, 10 F. Supp. 2d 420 (S.D.N.Y. 1998). The court permitted defendants to assert the res judicata defense in all twelve actions, concluding that plaintiffs had failed to demonstrate any "material prejudice." Id. at 423. On the merits, the court found that res judicata barred the plaintiffs' facial challenge to Directive 2262 because (1) the voluntary dismissal with prejudice of the claims in the Seabrook action constituted an adjudication on the merits; (2) plaintiffs were in privity with Norman Seabrook who brought the action in his capacity as president; and (3) plaintiffs' constitutional claims were, or could have been, raised in the Seabrook action. The court also concluded that most of plaintiffs' as-applied claims were "either sufficiently general or sufficiently inherent in a neutral application" of the amended sick leave policy that they too were, or reasonably could have been, raised in the earlier action. Id. at 426.
 
 
 27
 The court held in the alternative that even if the constitutional claims were not barred by res judicata, the DOC policy would survive a rational basis review. Id. at 424-25. The court also held that the as-applied claims possessed insufficient factual support to overcome a motion for summary judgment. The court rejected plaintiffs' contention that it was "physically impossible... to review forty (40) deposition transcripts and set forth each allegation which represents a constitutional violation under a particular amendment in a forty (40) page memorandum," and held that plaintiffs had "utterly failed to meet their burden to set forth admissible evidence supporting these claims or otherwise demonstrating that a genuine issue of material fact exists for trial." Id. at 426 & n.8. Final judgment was entered July 14, 1998.
 
 II
 
 28
 Although res judicata is an affirmative defense that should be raised in the defendant's answer, the district court has the discretion to entertain the defense when it is raised in a motion for summary judgment, by construing the motion as one to amend the defendant's answer. Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993). We review the district court's decision to grant a party leave to amend for abuse of discretion. Tokio Marine and Fire Ins. Co. v. Employers Ins. of Wausau, 786 F.2d 101, 103 (2d Cir. 1986).
 
 
 29
 Rule 15 of the Federal Rules of Civil Procedure provides that leave to amend a party's pleading "shall be freely given when justice so requires." Fed.R.Civ.Proc. 15. The Rule reflects two of the most important principles behind the Federal Rules: pleadings are to serve the limited role of providing the opposing party with notice of the claim or defense to be litigated, see Conley v. Gibson, 355 U.S. 41, 47-48, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957), and "mere technicalities" should not prevent cases from being decided on the merits, see Foman v. Davis, 371 U.S. 178, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962). See also 6 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d 1472 (2d ed. 1990). Thus, absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility, Rule 15's mandate must be obeyed. Foman, 371 U.S. at 182.
 
 
 30
 The circumstances surrounding the untimely assertion of res judicata were clarified during oral argument before Judge Rakoff. After a personnel changeover in the office of the Corporation Counsel, ten of the twelve cases were assigned to lawyers who had not worked on the Seabrook action and were unaware of the stipulation. Consequently, the answers they prepared and filed within the applicable deadlines did not include the affirmative defense.[3] In the other two cases, Ball and Almodovar, the attorney assigned to file the answers was transferred to another matter and, in the transition, none was filed. The omission was discovered by lead counsel after the Seabrook stipulation was brought to his attention. Corporation Counsel requested leave to file the two remaining answers and plaintiffs waived any objection, apparently without knowledge that defendants would for the first time include the defense of claim preclusion. The two answers in Ball and Almodovar, covering 30 of the 40 individual plaintiffs, are dated November 12, 1997. Paragraphs 75 and 959, respectively, state that plaintiffs' "claims are barred, in whole or in part, by res judicata and collateral estoppel." The court characterized these events at oral argument as an "organizational snafu" and found no evidence of bad faith or dilatory motive on the part of the Corporation Counsel.
 
 
 31
 Thus, we are asked on appeal to consider whether plaintiffs were unduly prejudiced by the court's decision to allow the defense of res judicata to be asserted by defendants for the first time on summary judgment. In determining what constitutes "prejudice," we generally consider whether the assertion of the new claim or defense would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." Block, 988 F.2d at 350. None of these three conditions is present in this action. The crux of appellants' argument, however, is that prejudice here comes in the form of misallocated resources. The officers contend that defendants' delay caused them to waste time and money deposing witnesses and preparing for a trial on the merits when they should have been focusing their discovery on issues of privity, the breadth of the Seabrook settlement, and the motivation of the "class representatives" in an effort to survive the charge of claim preclusion.
 
 
 32
 As the district court correctly noted, the fact that one party has spent time and money preparing for trial will usually not be deemed prejudice sufficient to warrant a deviation from the rule broadly allowing amendment to pleadings. See Block, 988 F.2d at 351. Rather, we will be most hesitant to allow amendment where doing so unfairly surprises the non-movant and impedes the fair prosecution of the claim. Thus, in Block, we permitted defendants to assert an affirmative defense in their motion for summary judgment four years after the complaint was filed because plaintiffs had knowledge of the facts giving rise to the defense. Id. at 350-51; see also Han v. Mobil Oil Corp., 73 F.3d 872, 877-78 (9th Cir. 1995) (fact that plaintiff had the information giving rise to the defense weighs against argument that plaintiff was prejudiced by the delay). The record indicates that plaintiffs' counsel, Leeds & Morelli, was well aware of the Seabrook stipulation.[4] The firm was retained by James Palozzolo in 1996 and filed an action on his behalf on January 3, 1997, to collect from COBA the attorneys' fees associated with prosecution of the suit referred to in the excised paragraph of the stipulation. Thus, even assuming that Leeds & Morelli only learned the details of the Seabrook settlement late in 1996, that is still twelve months before defendants' motion for summary judgment was filed on December 9, 1997. Defendants' untimely amendment did not unfairly surprise plaintiffs or impede the fair prosecution of their claims.
 
 III
 
 33
 The doctrine of res judicata, or claim preclusion, holds that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."[5] Allen v. McCurry, 449 U.S. 90, 94, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980); Burgos v. Hopkins, 14 F.3d 787, 789 (2d Cir. 1994). "Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." NLRB v. United Technologies, Corp., 706 F.2d 1254, 1260 (2d Cir. 1983) (citation omitted). To prove the affirmative defense a party must show that 1) the previous action involved an adjudication on the merits; 2) the previous action involved the plaintiffs or those in privity with them; and 3) the claims asserted in the subsequent action were, or could have been, raised in the prior action. Allen, 449 U.S. at 94; Burgos, 14 F.3d at 789; Chase Manhattan Bank, N.A. v. Celotex Corp., 56 F.3d 343, 345-46 (2d Cir. 1995).
 
 
 34
 On appeal, plaintiffs no longer contest that the settlement agreement is a final judgment on the merits. See Greenberg v. Board of Governors of Fed. Reserve Sys., 968 F.2d 164, 168 (2d Cir. 1992). Rather, the officers make three principal arguments that the Seabrook settlement cannot stand as a bar to this action: first, Norman Seabrook cannot be said to be in privity with the officers to the extent that he has waived their constitutional rights; second, the excised paragraph of the stipulation indicates that the parties presumed continued litigation over the Directive's constitutionality; and third, res judicata cannot bar as-applied claims that post-date the settlement. We consider each of these arguments in turn.
 
 
 35
 a. Privity
 
 
 36
 It is well settled in this circuit that literal privity is not a requirement for res judicata to apply. See, e.g., Chase Manhattan, 56 F.3d at 346 ("Whether there is privity between a party against whom claim preclusion is asserted and a party to prior litigation is a functional inquiry in which the formalities of legal relationships provide clues but not solutions."). Instead, a party will be bound by the previous judgment if his "interests were adequately represented by another vested with the authority of representation." Alpert's Newspaper Delivery Inc. v. The New York Times Co., 876 F.2d 266, 270 (2d Cir. 1989). This principle has been extended to preclude workers from challenging consent decrees entered into by their union. See, e.g., United States v. International Bhd. of Teamsters, 905 F.2d 610, 622-23 (2d Cir. 1990) (holding that union official was bound by terms of disciplinary mechanism set in place by consent decree between the United States and union, notwithstanding fact that official was not a party to original lawsuit nor signatory of consent decree); United States v. International Bhd. of Teamsters, 931 F.2d 177, 185-186 (2d Cir. 1991) (concluding that IBT subordinate entities - members, locals, joint councils, and area conferences - were bound by consent decree even though they were nonparties to original action where union adequately represented the interests of the collective membership). It is clear that Norman Seabrook brought the earlier action in "his capacity as President of the Correction Officers' Benevolent Association" in an effort to protect the rights of COBA members subject to Directive 2262. Each plaintiff here belonged at all relevant times to COBA, the "sole and exclusive collective bargaining representative for the unit consisting of employees of New York City in the titles of Correction Officer...." There is no evidence that individual union members sought to intervene in the first lawsuit or that Norman Seabrook was not authorized to proceed on their behalf. The second prerequisite for res judicata is present here.
 
 
 37
 Appellants contend, however, that they cannot be considered in privity with Norman Seabrook because he had no authority to waive their constitutional rights. They direct our attention to a series of cases insulating due process rights from state encroachment: Cleveland Board of Education v. Loudermill, 470 U.S. 532, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985); Logan v. Zimmerman Brush Co., 455 U.S. 422, 71 L. Ed. 2d 265, 102 S. Ct. 1148 (1982); and Vitek v. Jones, 445 U.S. 480, 63 L. Ed. 2d 552, 100 S. Ct. 1254 (1980). Those cases, they argue, read in conjunction with Justice Powell's declaration in Abood v. Detroit Board of Education, 431 U.S. 209, 253, 52 L. Ed. 2d 261, 97 S. Ct. 1782 (1977) (Powell, J., concurring in judgment), that a collective-bargaining agreement to which a state is a party is "fully subject to the constraints that the Constitution imposes on coercive governmental regulation," establish that COBA may not waive its members' constitutional rights. Therefore, because Directive 2262 "substantially impairs" the officers' "fundamental constitutional rights," Norman Seabrook had no authority to sign the stipulation and it cannot be said that the interests of COBA members were "adequately represented." See Alperts, 876 F.2d at 270.
 
 
 38
 The officers misconceive the res judicata inquiry. They ask us, in effect, to reevaluate the merits of the first action in order to assess the adequacy of their representation. The doctrine of res judicata, however, was established as a means to promote legal economy and certainty. Expert Electric Inc. v. Levine, 554 F.2d 1227, 1232 (2d Cir.), cert. denied, 434 U.S. 903, 54 L. Ed. 2d 190, 98 S. Ct. 300 (1977). The entry of a consent judgment has a preclusive effect not simply because it is an exercise of judicial power entitled to appropriate respect,[6] but because of the policy favoring finality of judgments. Amalgamated Sugar Co. v. NL Industries, Inc., 825 F.2d 634, 639 (2d Cir.), cert. denied, 484 U.S. 992 (1987). As the Supreme Court explained a century ago,
 
 
 39
 Enforcement of [res judicata] is essential to the maintenance of social order; for the aid of judicial tribunals would not be invoked for the vindication of rights of person and property if, as between parties and their privies, conclusiveness did not attend the judgments of such tribunals in respect of all matters properly put in issue, and actually determined by them.
 
 
 40
 Southern Pacific R. Co. v. United States, 168 U.S. 1, 48-49, 42 L. Ed. 355, 18 S. Ct. 18 (1897), quoted in Teltronics Servs., Inc. v. L M Ericsson Telecomms., Inc., 642 F.2d 31, 36 n.8 (2d Cir.), cert. denied, 450 U.S. 978, 67 L. Ed. 2d 813, 101 S. Ct. 1511 (1981). Relitigating the constitutional propriety of Directive 2262 now would not only do a disservice to defendants, it would undermine the ability of labor associations to vindicate their members' rights in court.[7]
 
 
 41
 Loudermill and Abood may represent an exception[8] to the Supreme Court's general understanding that employees are bound by their union's decisions as quid pro quo for the benefit they receive from collective bargaining. See United Mine Workers of America Health and Retirement Funds v. Robinson, 455 U.S. 562, 71 L. Ed. 2d 419, 102 S. Ct. 1226 (1982); NLRB v. Magnavox Co. of Tennessee, 415 U.S. 322, 325, 39 L. Ed. 2d 358, 94 S. Ct. 1099 (1974); Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 455, 1 L. Ed. 2d 972, 77 S. Ct. 912 (1957); Ford Motor Co. v. Huffman, 345 U.S. 330, 97 L. Ed. 1048, 73 S. Ct. 681 (1953). These latter cases rest on the notion that an individual employee's right to challenge the terms of a collective bargaining agreement must be limited if collective bargaining is to exist at all. This principle will only give way when the Constitution so requires,[9] when Congress has directed otherwise,[10] or when a contrary result would unravel collective bargaining altogether. Thus, in Metropolitan Edison v. NLRB, 460 U.S. 693, 75 L. Ed. 2d 387, 103 S. Ct. 1467 (1983), the Court held that "a union may bargain away its members' economic rights, but it may not surrender rights that impair the employees' choice of their bargaining representative." Id. at 705-706, citing Magnavox, 415 U.S. at 325 (union cannot waive employee's right to strike against unfair labor practices).
 
 
 42
 Similarly, the Supreme Court has recognized that individual workers benefit when their union litigates on their behalf. International Union, United Auto., Aerospace, and Agric. Implement Workers of America [UAW] v. Brock, 477 U.S. 274, 91 L. Ed. 2d 228, 106 S. Ct. 2523 (1986). "An association suing to vindicate the interests of its members can draw upon a pre-existing reservoir of expertise and capital. Besides financial resources, organizations often have specialized expertise and research resources relating to the subject matter of the lawsuit that individual plaintiffs lack." Id. at 289 (citation and internal quotation marks omitted). These "special features, advantageous both to the individuals represented and to the judicial system as a whole[,]" justify the potential cost of preclusion imposed on individual members. Id. Holding in Brock that the UAW had associational standing to challenge a policy directive issued by the Secretary of Labor, the Court answered concerns that individual workers would not be protected by the procedural safeguards associated with formal class certification under Rule 23 of the Federal Rules of Civil Procedure. Should the evidence show an association was unable to "represent adequately the interests of all [its] injured members... a judgment won against it might not preclude subsequent claims by the association's members without offending due process principles." Id. at 290.
 
 
 43
 Norman Seabrook was freely chosen to be the authorized bargaining representative for COBA members in 1996. He challenged Directive 2262 in court on grounds virtually identical to those underlying this action and brought the action in his capacity as president of the union for the benefit of the members.[11] Absent evidence of collusion between Seabrook and the DOC,[12] plaintiffs are now bound to accept the amended sick leave policy to which he agreed.
 
 
 44
 b. The Significance of the Excised Paragraph
 
 
 45
 The officers argue that "A careful reading of the Stipulation reveals that the parties who signed it did not intend to bar future challenges to the constitutionality - facial and as-applied - of the sick leave policy." They rest this claim not on the text, but on language ostensibly omitted from the agreement. First, they note the absence of any language specifically precluding future constitutional challenges to Directive 2262 and, second, they point to the parties' decision to strike paragraph "4" from the document.[13]
 
 
 46
 With respect to the claimed omission, we note that there is clear language in the document indicating the parties' desire for finality: "Whereas, the parties now desire to resolve the issues arising from this litigation without further proceedings." The stipulation calls for dismissal of the action "with prejudice" so long as the defendants agreed to amend Directive 2262. For the very reasons discussed in this opinion, the parties could presume from this language that subsequent constitutional challenges to Directive 2262 (by Seabrook, by COBA, and by union members whose interests were represented in the prior proceeding) would be precluded. Finally, the parties provided the appropriate procedures to contest subsequent amendments to Directive 2262 by establishing notice requirements, ensuring that Judge Block retained jurisdiction, and clarifying that either party may move to reopen the matter.
 
 
 47
 With respect to the excision of Paragraph 4, we can only surmise that initially the two pending actions were to be exempted from the stipulation. We see no evidence that this plan was altered because "it was clear to all parties that the constitutionality of the sick leave policy would continue to be litigated in the future."
 
 
 48
 c. Identity of Claims
 
 
 49
 Plaintiffs' third argument concerns whether there is a sufficient identify of claims to support a finding of res judicata. "Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." United Technologies, 706 F.2d at 1260. The officers begin by pointing out that the Seabrook stipulation resulted in a revised sick leave policy. Thus, they argue, res judicata cannot bar any challenge to the version of the policy in place after the signing of the stipulation on April 9, 1996 because it is not the same, i.e., identical, policy challenged by the Seabrook complaint. This semantic cartwheel would virtually eliminate the doctrine of res judicata for a significant subset of those claims resolved by settlement agreement. Parties would have no incentive to modify a controversial policy if the amended version was subject to renewed attack. The efficiencies created by a mutually agreeable settlement would be lost.
 
 
 50
 There is ample precedent to show that mere modification of a challenged policy will not alone undo the preclusive effect of a former judgment. In Nash v. Bowen, 869 F.2d 675, 679 (2d Cir.), cert. denied, 493 U.S. 813 (1989), for example, we held that res judicata precluded a challenge by an administrative law judge to new procedural rules because his claim was "substantially identical" to one brought four years earlier by the Association of ALJs, of which he was a member. We reached this result even though the Association's claim concerned a distinct (and discontinued) program. We concluded that "the 'Bellmon Review Program' [was] for all intents and purposes the same as the 'Quality Assurance System'" to which Nash now objected, and, therefore, his claims were either raised in the Association case or "could have been raised" in that action. Id. The two versions of Directive 2262 have an even greater affinity.
 
 
 51
 Plaintiffs' assertion of new incidents arising from the application of the challenged policy is also insufficient to bar the application of res judicata. See Norman v. Niagara Mohawk Power Corp., 873 F.2d 634, 638 (2d Cir. 1989) (holding prior dismissal of civil rights claims precluded whistle blower's subsequent RICO action despite allegations of new acts of harassment); Waldman v. Village of Kiryas Joel, 39 F. Supp. 2d 370, 379 (S.D.N.Y. 1999) (concluding res judicata barred resident's Establishment Clause claims even though complaint relied on facts that post-dated prior judgments), aff'd 207 F.3d 105 (2d Cir. 2000). We look to see "whether the same transaction or connected series of transactions is at issue." United Technologies, 706 F.2d at 1260 (emphasis added); Brooks v. Giuliani, 84 F.3d 1454, 1463 (2d Cir. 1996) (applying New York law) (rejecting argument that state conduct post-dating prior action was not part of same transaction or series of transactions). "'Transaction' must be given a flexible, common-sense construction that recognizes the reality of the situation." See Interoceanica Corp. v. Sound Pilots, Inc., 107 F.3d 86, 91 (2d Cir. 1997). The hundreds of new incidents about which plaintiffs now complain fall within the same queue as those of injured officers who sought additional time out-of-residence under the earlier version.
 
 
 52
 Plaintiffs cannot elude this reality merely by invoking legal terms of art with constitutional mystique. See Wilkinson v. Pitkin County Bd. of County Comm'rs, 142 F.3d 1319, 1323 (10th Cir. 1998). Where all requirements are met, res judicata can act as a bar to virtually any sort of claim, including constitutional challenges to the facial validity of municipal regulations. See, e.g., Irish Lesbian and Gay Org. v. Giuliani, 143 F.3d 638, 646 (2d Cir. 1998) (barring organization's free speech and equal protection challenges to the facial validity of ordinance and accompanying interpretive police department regulations on the grounds that such claim had been, or could have been, litigated in previous action). The "as applied" label cannot obscure the fact that new time out-of-residence denials are part of the same series of transactions. If the new as-applied challenges are to aspects of the policy which survive the earlier litigation, then the claim itself was subsumed by the earlier litigation. See Nash, 869 F.2d at 679. If the as-applied challenges arise from new provisions of the policy to which an authorized representative has agreed, the members are bound by their representative's decision. See Teamsters, 931 F.2d at 184-185; Teamsters, 905 F.2d at 622.
 
 
 53
 This is not to say that Directive 2262 is forever immune from attack. Res judicata and collateral estoppel do not cement the status quo into perpetuity. "Modifications in 'controlling legal principles' could render a previous determination inconsistent with prevailing doctrine," Montana v. United States, 440 U.S. 147 at 161, 59 L. Ed. 2d 210, 99 S. Ct. 970 (quoting Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 599, 92 L. Ed. 898, 68 S. Ct. 715 (1948), and changed circumstances may sufficiently alter the factual predicate such that new as-applied claims would not be barred by the original judgment. Claims based on conduct or procedures which were not contemplated by, or a direct result of, the earlier action would not necessarily be precluded. If it was clear, for example, that all Catholics were now being denied religious exemptions, while all Muslims were granted extra rec time, it is unlikely that the Catholic's claim under 1983 would be barred by the Seabrook settlement. Likewise, a new administration might interpret and apply a particular provision in a manner not countenanced by either party to the settlement, in which case litigation might be permitted in order to interpret the scope or text of the consent decree. See Teamsters, 931 F.2d at 182-183 & n.1 (explaining that terms of complex consent decree often require ongoing interpretation and interlocutory review). The parties contemplated that further court action before Judge Block might be necessary and thus memorialized the court's continuing jurisdiction over the matter. The Federal Rules set forth additional procedures for a party interested in modifying a consent decree[14] and there are, moreover, any number of extra-judicial procedures with which the officers may address an untenable sick leave policy.[15]
 
 IV
 
 54
 Having concluded that res judicata barred the officers' facial challenge to Directive 2262, the district court found that most of plaintiffs' individual "as-applied" claims were "sufficiently general or sufficiently inherent in a neutral application of amended Directive 2262 that they reasonably could have been raised, or, in some cases, were in fact raised in Seabrook and are consequently barred by res judicata." Monahan, 10 F. Supp. 2d at 426. With respect to the remaining claims of harassment, wrongful punishment, disparate application of the sick leave policy, conspiracy, and discrimination on the basis of a disability, the court found that plaintiffs had "utterly failed to meet their burden to set forth admissible evidence supporting these claims or otherwise demonstrating that a genuine issue of material fact exists for trial with respect to these claims."[16] Id. Plaintiffs had complained it was "'unfair' for them to be required to sift through the relevant deposition transcripts to find evidence supporting each of their claims" and that the page limits governing their memorandum in opposition to defendants' motion for summary judgment made it impossible to "set forth each allegation which represents a constitutional violation." Id. (quoting plaintiffs' opposition brief at 19-20). The district court pointed out that the appropriate place to "set forth" each allegation was in plaintiffs' statement pursuant to Local Rule 56.1,[17] but their counter-statement was, nevertheless, "utterly bereft of record citations relating to the particulars of any of plaintiffs' claims of as-applied unconstitutionality." 10 F. Supp. 2d at 426 & n.8 (citing Riley v. Town of Bethlehem, 5 F. Supp. 2d 92 (N.D.N.Y. 1998) (denying motion for summary judgment for failure to supply record citations supporting statement of material facts); Union Carbide Corp. v. Montell N.V., 179 F.R.D. 425 (S.D.N.Y. 1998)). Accordingly, the district court granted the defendants' motion for summary judgment on all remaining claims.
 
 
 55
 On appeal, the officers do not specifically address the material elements of any of the as-applied claims. They do not appeal the grant of summary judgment on the claims of harassment, wrongful punishment, conspiracy, disparate application, or discrimination on the basis of a disability. Instead, the officers argue that the district court erred when it failed to consider their verified complaints[18] as admissible evidence in support of their claims that the sick leave policy "precluded Plaintiffs-appellants from engaging in constitutionally protected activities." Having reviewed plaintiffs' submissions to the lower court as well as the list of citations to the verified complaints provided for the first time on appeal, we agree with appellees that the district court appropriately dismissed all of the remaining as-applied claims alleging deprivation of constitutional liberties.
 
 
 56
 It is true that a verified complaint may serve as an affidavit for summary judgment purposes provided it meets the other requirements for an affidavit under Rule 56(e). Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (noting that Fed.R.Civ.Proc. 56(e) requires affidavits to be made on personal knowledge, to set forth facts that would be admissible in evidence, and to demonstrate the affiant's competency to testify to the matters in the affidavit); 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure 1339, at 152 (1990).
 
 
 57
 This does not mean, however, that parties opting to file a verified complaint earn a special pass to avoid Local Rule 56.1. A district court has the discretion to adopt local rules that are necessary to carry out the conduct of its business. Frazier v. Heebe, 482 U.S. 641, 645, 96 L. Ed. 2d 557, 107 S. Ct. 2607 (1987) (citing 28 U.S.C. 1654, 2071; Fed.R.Civ.Proc. 83). In the Southern and Eastern Districts of New York, a party opposing a motion for summary judgment shall file a short and concise statement of the material facts in dispute accompanied by citation to evidence which would be admissible. L.R. 56.1(b) and (d). Local Rule 56.1 is designed to place the responsibility on the parties to clarify the elements of the substantive law which remain at issue because they turn on contested facts. Cf. Lawler v. Jacobs Eng'g Group of Ohio, Inc., 25 F.3d 1053 (7th Cir. 1994) (table) (affirming grant of summary judgment after failure to comply with S.D.Ind.L.R. 56.1). "While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out." Downes v. Beach, 587 F.2d 469, 472 (10th Cir. 1978); see also Waldridge v. American Hoechst Corp., 24 F.3d 918, 923 n. 4 (7th Cir. 1994) (affording district court "considerable discretion" in applying its local rules); Hernandez v. George, 793 F.2d 264, 269 (10th Cir. 1986) (same).
 
 
 58
 Here, however, even a de novo review of the record guided by the citations in the appellate brief provides no help for the officers because plaintiffs' as-applied claims regarding the right to participate in "constitutionally protected activities" fail to survive the initial res judicata evaluation. As discussed above, the mere assertion of new incidents arising from the application of the challenged policy is insufficient to bar the application of res judicata. See Norman v. Niagara Mohawk Power Corp., 873 F.2d 634, 638 (2d Cir. 1989); Waldman v. Village of Kiryas Joel, 39 F. Supp. 2d 370, 379 (S.D.N.Y. 1999), aff'd 207 F.3d 105 (2d. Cir. 2000). Most of the incidents cited in plaintiffs' appellate brief, however, are part of the "same transaction or connected series of transactions" at issue in the Seabrook litigation. See United Technologies, 706 F.2d at 1260. The Seabrook complaint alleged that two plaintiffs seriously injured in the line of duty were denied leave to attend church service, to pick up a paycheck, and to take children to school. Indicating that these claims were meant to be representative of a series of unconstitutional denials, the complaint states that "Norman Seabrook ... through his office logged in excess of 150 complaints of a similar type by correction officers who were denied leave from their residence to attend religious services." The series continues with events complained of here. Appellants direct our attention, for example, to paragraphs in the Almodovar complaint alleging that Irwin Cohen was denied permission to attend Saturday morning Sabbath services at his temple; that Michael Messina was forced to pick up his pay check during his rec time; and that plaintiff Alice Bresloff was unable to take her children to church services required by their parochial school. Most of the cited paragraphs identify occasions on which officers were denied additional time beyond their four recreation hours to participate in religious programs or attend religious services, to participate in family activities or attend to the needs of family members, to travel, to attend organizational meetings or celebrations, to vote, to attend funerals or weddings, or to make trips to the pharmacy. A number of the cited paragraphs recount penalties given to officers who did not answer the door during a surveillance visit because they were in the shower or across the street at a birthday party. It is clear that these incidents fall within "the same transaction or series of transactions" at issue in the Seabrook litigation. Other than new particular details, "the facts essential to the second were present in the first." United Technologies, 706 F.2d at 1260.
 
 
 59
 There are a few anomalous allegations. Several plaintiffs state that they were ordered back to work too soon or assigned to duties inappropriate to their medical condition. Others claim that the Department failed to accommodate their disability by failing to provide a handicapped parking space or a motorized vehicle. An employer's duty to accommodate physical disabilities, however, is grounded in state and federal statutes and not the United States Constitution.[19] These allegations do not serve to make Directive 2262 unconstitutional as applied to individual circumstances. To the extent that these facts suggest a pattern or practice of harassment, plaintiffs have chosen not to appeal the district court's grant of summary judgment on those claims.
 
 
 60
 Affirmed.
 
 
 
 Notes:
 
 
 *
 Honorable James B. Moran, Senior United States District Judge for the Northern District of Illinois, sitting by designation.
 
 
 [1]
 Ball v. Sielaff, 90 Civ. 4456 (FB) (E.D.N.Y.); Palozzolo v. Abate, 92 Civ. 3305 (FB) (E.D.N.Y.).
 
 
 [2]
 On January 1, 1997, DOC instituted a pilot program which permits officers injured in the line of duty 24 hours out-of-residence for up to four months.
 
 
 [3]
 The officers point out on appeal that Assistant Corporation Counsel Martha Calhoun signed both the stipulation and the answer filed in the Monahan action.
 
 
 [4]
 At oral argument, counsel for plaintiffs admitted they had notice of the Seabrook action: "We knew about it? So what? We knew about it." The principles that governed our decision in Evans v. Syracuse City School Dist., 704 F.2d 44 (2d Cir. 1983), have no application here.
 
 
 [5]
 This is separate from the related doctrine of collateral estoppel, or issue preclusion, which "bars a party from relitigating in a second proceeding an issue of fact or law that was litigated and actually decided in a prior proceeding if that party had a full and fair opportunity to litigate the issue in the prior proceeding...." Metromedia Co. v. Fugazy, 983 F.2d 350, 365 (2d Cir. 1992), cert. denied, 508 U.S. 952, 124 L. Ed. 2d 662, 113 S. Ct. 2445 (1993). Although both defenses were raised in the answers, the district court dismissed the action based on claim preclusion and it is that decision we now review.
 
 
 [6]
 See 1B J. Moore, Moore's Federal Practice, P 0.409(5), p.1030 (2d ed. 1965) ("[A consent] judgment is not an inter partes contract; the court is not properly a recorder of contracts, but is an organ of government constituted to make judicial decisions and when it has rendered a consent judgment it has made an adjudication."), cited in Kaspar Wire Works, Inc., v. Leco Eng'g and Machine, Inc., 575 F.2d 530, 538-39 (5th Cir. 1978) (distinguishing consequences of consent decree for claim and issue preclusion).
 
 
 [7]
 Because we conclude that res judicata bars plaintiffs' facial challenge to the sick leave policy, we decline to review the district court's alternative holding that Directive 2262 should be evaluated under the "rational basis" test and that the policy is rationally related to the legitimate interests of the Department of Correction.
 
 
 [8]
 See Richard Wallace, Comment, Union Waiver of Public Employees' Due Process Rights, 8 Indus. Rel. L.J. 583, 596 (1986).
 
 
 [9]
 The due process cases cited by defendants stand for the proposition that "Certain substantive rights--life, liberty, and property--cannot be deprived except pursuant to constitutionally adequate procedures.... 'While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards.'" Loudermill, 470 U.S. at 541 (quoting Arnett v. Kennedy, 416 U.S. 134, 167, 40 L. Ed. 2d 15, 94 S. Ct. 1633 (1974) (Powell, J., concurring in part and concurring in result in part)). Procedural due process rights are accorded special protection because they belong to that special category of rights first described in Justice Stone's famous footnote 4, namely those that are necessary to protect all other rights from encroachment by a more powerful majority. United States v. Carolene Prods. Co, 304 U.S. 144, 153 n.4, 82 L. Ed. 1234, 58 S. Ct. 778 (1938).
 The allegation, however, that the officers' procedural due process rights, i.e. those implicated by an application of the sick leave policy, were not adequately protected by the prior litigation is insufficient to bar the application of res judicata. See, e.g., Jones v. Texas Tech University, 656 F.2d 1137 (5th Cir. 1981) (consent judgment in prior action by plaintiff alleging, in both representational and individual capacities, that university officials deprived plaintiff and other members of student organization of their rights to freedom of speech and due process of law barred second suit on res judicata grounds where second action alleged that procedures pursuant to which he was placed on probation and restricted from campus leadership activities violated his individual due process rights); Sanders v. United States, 34 Fed. Cl. 38 (Fed.Cl. 1995); Multi-State Communications, Inc. v. United States, 648 F. Supp. 1203 (S.D.N.Y. 1986).
 
 
 [10]
 See Robinson, 455 U.S. at 575 (citing Franks v. Bowman Transp. Co. Inc., 424 U.S. 747, 47 L. Ed. 2d 444, 96 S. Ct. 1251 (1976) (terms of collective bargaining agreement must comply with Title VII); Corning Glass Works v. Brennan, 417 U.S. 188 (1974) (Equal Pay Act); Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 285, 90 L. Ed. 1230, 66 S. Ct. 1105 (1946); Norfolk & Western R. Co. v. Nemitz, 404 U.S. 37, 30 L. Ed. 2d 198, 92 S. Ct. 185 (1971) (Interstate Commerce Act)).
 
 
 [11]
 The Seabrook complaint, for example, alleged that two plaintiffs seriously injured in the line of duty were denied leave from their residence to attend church service, to pick up a paycheck, or to take children to school. It further averred that "Norman Seabrook ... through his office logged in excess of 150 complaints of a similar type by correction officers who were denied leave from their residence to attend religious services." The complaint alleged that defendants conspired to deprive plaintiffs of their First Amendment rights in violation of 42 U.S.C. 1985. The Seabrook plaintiffs not only sought a judgment declaring Directive 2262 as unconstitutional on its face, but also requested an injunction barring defendants and their successors from "subjecting correction officers entitled to sick leave to unlawful violation of their First Amendment freedoms and ... an appropriate remedy to the aforesaid abuse of discretion."
 
 
 [12]
 We could imagine a different result if it appeared that union leadership and management sought to use litigation and a consent decree to take an issue off the bargaining table against the best interests of a particular class of current or future employees.
 
 
 [13]
 Paragraph 4 provided in its entirety:
 The parties agree that the amendment of Section VII of Directive 2262, annexed hereto as Exhibit "A" also resolves all issues of declaratory and injunctive relief sought in the companion cases of Ball v. Sielaff, et al., 90 Civ. 4456 (FB), and Palozzolo v. Abate, et al., 92 Civ. 3305 (FB), and those claims for relief are also hereby dismissed with prejudice and without costs.
 
 
 [14]
 The Supreme Court discussed the relevant burdens of proof in Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 116 L. Ed. 2d 867, 112 S. Ct. 748 (1992):
 A party seeking modification of a consent decree [under Fed.R.Civ.Proc. 60(b)] may meet its initial burden by showing either a significant change in factual conditions or in law. Modification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous.... Ordinarily, however, modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree. If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b).
 Id. at 384-85.
 
 
 [15]
 Officers dissatisfied with the outcome of the prior action may choose to oust union leaders responsible for the settlement, reject future agreements that include adherence to Directive 2262, or seek a legislative solution.
 
 
 [16]
 To defeat the defendants' summary judgment motion, the officers were required to make a showing sufficient to establish the existence of elements essential to their case, and on which they would bear the burden of proof at trial. Citizens Bank of Clearwater v. Hunt, 927 F.2d 707, 710 (2d Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)); see also Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 177-78 (2d Cir. 1990) ("The non-movant..., who must sustain the ultimate burden of proof, must demonstrate in opposing a summary judgment motion that there is some evidence which would create a genuine issue of material fact."), cert. denied, 500 U.S. 928, 114 L. Ed. 2d 125, 111 S. Ct. 2041 (1991).
 
 
 [17]
 Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York governs "Statements of Material Facts on Motion for Summary Judgment." It provides in relevant part that
 (b) The party opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried. (c) All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. (d) Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).
 
 
 [18]
 The "Almodovar" verified complaint, sworn by eleven of the 40 plaintiffs is 223 pages and 958 paragraphs long. It contains a mixture of factual allegations and legal conclusions. Count One charges that the policy is facially unconstitutional and that defendants lack sufficient guidelines for discretionary decisions regarding time out-of-residence requests. Counts Two through Thirty set forth the particular details of each plaintiff's experience with Directive 2262 and conclude with the identical allegation that "Directive 2262 is unconstitutional as applied to plaintiffs in that it is and has been applied in a willful and malicious manner by defendants with an intent to harass or intimidate plaintiff and deprive him [or "her"] of his [or "her"] fundamental constitutional rights." See, e.g., Almodovar cplt. PP 87, 127, 167, 211, 235, 295, 326, 361, 388, 425, 461, 483, 517, 537, 557, 591, 626, 660, 680, 708, 728, 764, 783, 807, 845, 874, 895, 912, and 946. Count Thirty-one alleges a conspiracy to deprive plaintiffs of their constitutional rights in violation of 42 U.S.C. 1985. Count Thirty-two alleges that plaintiffs were denied benefits and privileges as a result of their classification as sick-leave abusers. Eleven other substantially-similar actions, each initiated by a verified complaint, were consolidated with the Almodovar action on March 14, 1997. Plaintiff Lorde alone included a claim of disability discrimination under New York state law.
 
 
 [19]
 See, e.g., the Americans with Disabilities Act of 1990 (ADA), Pub.L. 101-336, 104 Stat. 327, and analogous state statutes.