# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| LABORERS' DISTRICT COUNCIL CONSTRUCTION INDUSTRY PENSION FUND and HALLANDALE BEACH POLICE OFFICERS AND FIREFIGHTERS' PERSONNEL RETIREMENT FUND, derivatively on behalf of LULULEMON ATHLETICA, INC., | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 11293-CB |
| ROBERT BENSOUSSAN, MICHAEL CASEY, ROANN COSTIN, CHRISTINE M. DAY, WILLIAM H. GLENN, MARTHA A.M. MORFITT, RHODA M. PITCHER, THOMAS G. STEMBERG, JERRY STRITZKE, EMILY WHITE, and DENNIS J. WILSON, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| LULULEMON ATHLETICA, INC., a Delaware Corporation, | ) ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 15, 2016
Date Decided: June 14, 2016

Jessica Zeldin and P. Bradford deLeeuw, ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware, *Counsel for Plaintiffs*.

Marlon E. Kimpson, Joshua C. Littlejohn, Max N. Gruetzmacher, and Meredith B. Miller, MOTLEY RICE LLC, Mount Pleasant, South Carolina, *Counsel for Plaintiff Laborers' District Council Construction Industry Pension Fund*.

Gustavo F. Bruckner and Anna Manalaysay, POMERANTZ LLP, New York, New York; Jayne A. Goldstein, POMERANTZ LLP, Weston, Florida, *Counsel for Plaintiff Hallandale Beach Police Officers and Firefighters' Personnel Retirement Fund*.

Bradley R. Aronstam and S. Michael Sirkin, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Joseph S. Allerhand, Stephen A. Radin, Caroline Hickey Zalka, Robert S. Ruff III, and Thomas G. James, WEIL, GOTSHAL & MANGES LLP, New York, New York, *Counsel for Defendants Robert Bensoussan, Michael Casey, RoAnn Costin, Christine M. Day, William H. Glenn, Martha A.M. Morfitt, Rhoda M. Pitcher, Thomas G. Stemberg, Jerry Stritzke and Emily White*.

Stephen P. Lamb and Daniel A. Mason, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Audra J. Soloway and Brette Tanenbaum, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York, *Counsel for Defendant Dennis J. Wilson*.

John L. Reed, DLA PIPER LLP, Wilmington, Delaware, *Counsel for Nominal Defendant lululemon athletica inc*.

**BOUCHARD, C.**

In December 2012, Dennis Wilson, the founder of lululemon athletica, inc. ("Lululemon" or the "Company") established a trading plan designed to comply with federal securities laws whereby he delegated to a brokerage firm the authority to sell some of his Lululemon shares under certain conditions. On June 5, 2013, Wilson learned that Christine Day intended to resign from her position as the Company's Chief Executive Officer. On June 7, the brokerage firm sold some of Wilson's shares in accordance with the numerical parameters of the trading plan, yielding over $49.5 million in proceeds for Wilson. On June 10, after the stock market closed, the Company publicly announced Day's intention to resign. The next day, Lululemon's stock price fell more than 17 percent.

The remarkable timing of Wilson's June 7 stock sale received immediate attention in the financial media and quickly became the subject of litigation. In August 2013, two stockholders filed an action in the United States District Court for the Southern District of New York (the "NY Action") asserting various derivative claims, including that Wilson breached his fiduciary duties as a director of the Company under *Brophy v. Cities Service Co.*[1] and its progeny by using material non-public information to sell stock for his personal financial gain. In April 2014, the district court dismissed all of the claims in the NY Action,

_____

[1] 70 A.2d 5 (Del. Ch. 1949).

including the *Brophy* claim, because of plaintiffs' failure to adequately allege that making a demand on the Company's board would have been futile.

In July 2015, after obtaining books and records from the Company under 8 *Del. C.* § 220, two other stockholders of the Company filed this action asserting two derivative claims: a *Brophy* claim against Wilson similar to the one that had been dismissed in the NY Action, and a breach of fiduciary duty claim against the members of the Company's board as of the date of the June 7 stock sale for failing to investigate and take any action against Wilson relating to that sale.

Defendants moved to dismiss both of these claims, arguing that they are precluded by the district court's ruling in the NY Action. New York law governs this question. For the reasons explained below, I conclude that the claims asserted here are barred based on principles of both issue and claim preclusion.

## I. BACKGROUND

Unless noted otherwise, the facts recited in this memorandum opinion are based on the allegations of the Verified Stockholder Derivative Complaint (the "Complaint"), the exhibits attached thereto, and facts of which the Court may take judicial notice.

**A.    The Parties**

Nominal defendant Lululemon is a Delaware corporation headquartered in Vancouver, Canada, that manufactures and markets high-end, yoga-inspired athletic wear.  It operates hundreds of stores in multiple countries.

Plaintiffs Laborers' District Council Construction Industry Pension Fund and Hallandale Beach Police Officers and Firefighters' Personnel Retirement Fund are alleged to have been Lululemon stockholders at all relevant times.

The Complaint names eleven individuals as defendants.  Each was a Lululemon director on June 7, 2013, the date of the sale of Lululemon shares owned by Wilson that is challenged in this action, and during the ensuing weeks when it is alleged that the Company's board should have investigated the circumstances of that sale and taken action against Wilson.  Eight of these eleven individuals were members of the Company's board of directors when the Complaint was filed:  Robert Bensoussan, Michael Casey, RoAnn Costin, William Glenn, Martha A.M. Morfitt, Rhoda M. Pitcher, Thomas G. Stemberg,[2] and Emily White (the "Demand Board").

Three of the defendants were no longer directors of Lululemon when the Complaint was filed:  Dennis J. Wilson, Christine Day, and Jerry Stritzke.  Wilson

---

[2] On November 19, 2015, plaintiffs dismissed all claims against Stemberg, without prejudice.

3

founded Lululemon in 1998.  He served in various officer positions between 1998 and 2012, and resigned as a director in February 2015.  Day was Lululemon's Chief Executive Officer before her resignation became effective in December 2013, and a director from June 2008 to December 2013.  Stritzke was a director from June 2012 to September 2013.

## B.     Wilson Sells Shares Through a 10b5-1 Trading Plan

On December 10, 2012, Wilson informed the Company that he planned to sell a portion of his stake in Lululemon through a trading plan designed to comply with Rule 10b5-1 of the Securities Exchange Act of 1934.  Rule 10b5-1 "permits insiders to implement written, pre-arranged stock trading plans when they are not in possession of material non-public information."[3]  Generally speaking, 10b5-1 plans offer a safe harbor for corporate insiders to sell stock by ceding trading authority to third parties with exclusive discretion to execute trades under certain pre-determined parameters.

Wilson's 10b5-1 plan (the "Trading Plan") authorized Merrill Lynch, Pierce, Fenner & Smith Incorporated to sell up to 5.7 million shares of Wilson's Lululemon stock in two groups.[4]  In the first group, Merrill Lynch could sell up to 300,000 shares at prevailing market prices between January 10, 2013 and

---

[3] Compl. ¶ 31; *see also* 17 C.F.R. § 240.10b5-1(c).

[4] *See* Compl. Exs. D-E.

December 31, 2013. In the second group, Merrill Lynch could sell up to 5.4 million shares for no less than $81.25 per share between January 10, 2013 and June 30, 2014. No more than 1 million shares could be sold in any given month under the Trading Plan.

In the representations and warranties section of the Trading Plan, Wilson promised not to disclose any material nonpublic information to any Merrill Lynch employee or otherwise "exercise any influence over how, when or whether to effect sales of Shares" while the plan was in effect.[5] Wilson's intent to establish the Trading Plan, as well as a general description of the amount of shares the Trading Plan covered and the period of its applicability, were disclosed publicly in a Form 8-K dated December 11, 2012.[6]

When the Trading Plan was established, Wilson owned approximately 30% of the Company's outstanding shares. During the dates listed below in January, May, and June of 2013, each of which fell within the trading windows of the Trading Plan, Merrill Lynch sold 2.3 million shares of Wilson's Lululemon stock for total proceeds of $184,408,558.[7] After these trades were made, Wilson owned

---

[5] Compl. Ex. F §§ 6.6–6.7.

[6] lululemon athletica inc., Current Report (Form 8-K) (Dec. 11, 2012).

[7] Compl. ¶ 56.

about 39.9 million shares, or approximately 27% of the Company's outstanding shares.

| Month | Day | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| January 2013 | 10 | 87,200 | $70.35 | $6,134,878 |
| | 10 | 12,800 | $70.92 | $907,786 |
| | 11 | 55,600 | $70.40 | $3,913,968 |
| | 11 | 44,400 | $70.83 | $3,144,634 |
| | 14 | 68,800 | $72.00 | $4,953,545 |
| | 14 | 31,200 | $71.19 | $2,221,081 |
| Total | | 300,000 | | $21,275,892 |
| May 2013 | 10 | 18,675 | $81.25 | $1,517,394 |
| | 13 | 2,977 | $81.25 | $241,896 |
| | 14 | 397,351 | $81.38 | $32,336,583 |
| | 15 | 159,188 | $81.40 | $12,958,588 |
| | 16 | 6,532 | $81.30 | $531,054 |
| | 17 | 37,862 | $81.26 | $3,076,636 |
| | 20 | 2,201 | $81.25 | $178,831 |
| | 21 | 375,214 | $81.68 | $30,645,641 |
| Total | | 1,000,000 | | $81,486,623 |
| June 2013 | 4 | 369,128 | $81.84 | $30,210,949 |
| | 4 | 23,327 | $81.31 | $1,919,933 |
| | 7 | 607,545 | $81.50 | $49,515,161 |
| Total | | 1,000,000 | | $81,646,043 |
| GRAND TOTAL | | 2,300,000 | | $184,408,558 |

The nature and timing of these trades track the mechanics of Wilson's Trading Plan. In January, when the Company's stock traded below $81.25, Merrill Lynch exhausted Wilson's "group one" share allotment by selling 300,000 shares

at then-prevailing market prices. Merrill Lynch thus could not sell any more shares under the Trading Plan until Lululemon's stock price reached $81.25 per share, which did not occur until May 2013.

According to the Complaint, several setbacks depressed Lululemon's stock price between January and May. On January 14, 2013, the Company reported a downward revision of its guidance for the holiday shopping season. Two months later, in mid-March, Lululemon announced a recall of black Luon yoga pants—one of the Company's most popular items—due to unacceptable levels of sheerness. The Company's stock price declined to $63.32 in early April. Prices rebounded after the Company announced certain organizational changes, including the termination of its Chief Product Officer. On May 10, Lululemon stock reached a new all-time intraday high of $81.30 per share. That day, Merrill Lynch re-initiated sales of Wilson's stock after its value reached the $81.25 per-share threshold for the "group two" allotment in the Trading Plan. Merrill Lynch sold the full monthly allotment of 1 million shares available under the Trading Plan in May at prices above $81.25 per share.

### C. The June 2013 Trades and Day's Resignation

On June 3, 2013, the Company announced that it would begin restocking its stores with the previously recalled black Luon yoga pants. After this announcement, Lululemon's stock price appreciated three percent. On June 4,

7

Merrill Lynch sold 392,455 of Wilson's shares, at prices ranging from approximately $81.30 to $81.84 per share.

On June 5, 2013, Wilson and Day discussed their respective long-term strategic visions for the Company and came to an apparent impasse that led Day to send Wilson an email later that night, stating that she intended to resign as CEO and that she would like to announce her forthcoming resignation the following week.[8] In a series of emails on June 5 and 6, Day also informed outside director Michael Casey that she would resign, that she would inform the board of her decision soon, and that only a handful of individuals, including Wilson, knew about her decision at that point.[9] On Friday, June 7, Day informed the board of her intent to resign as soon as a replacement could be found.[10] Day's planned departure was publicly announced after the market closed on Monday, June 10. The next day, on June 11, Lululemon's stock price fell more than 17%, to close at $67.85 per share.

On June 7, before the public announcement of Day's intent to resign, Merrill Lynch sold 607,545 of Wilson's shares—the remainder of his 1 million share

---

[8] Compl. ¶ 47; Compl. Ex. G.

[9] Compl. ¶ 48-49; Compl. Ex. H.

[10] Compl. ¶ 52.

8

allotment for June 2013—at an average price of $81.50 per share. The June 7 trade is at the heart of plaintiffs' claims in the Complaint.[11]

The size and timing of the June 7 trade generated media interest. According to an internal Lululemon email, representatives for Wilson told a reporter for the *Wall Street Journal* that the June 2013 trades were made under the Trading Plan and that Wilson "had no influence on trades conducted by Merrill Lynch pursuant to either of these plans."[12] The reporter requested information about the triggers under the Trading Plan with regard to the June trades and certain earlier sales by Wilson. On June 12, 2013, the *Wall Street Journal* and *Reuters* released articles questioning Wilson's trading activity, particularly the June 7 trade. The *Wall Street Journal* article stated, in relevant part:

> On Friday, the day Lululemon's board was notified that CEO Christine Day intended to vacate her post, Mr. Wilson sold 607,545 shares at a price of $81.50 apiece, for proceeds of $49.5 million. The company announced the CEO's departure plans after the market closed on Monday. On Tuesday, Lululemon's stock fell more than 17% to $67.85. A sale at that price would have brought Mr. Wilson about $8 million less than he reaped by selling his stock the previous week.[13]

---

[11] Although plaintiffs question the propriety of trades before June 7, their arguments are premised solely on defendants' alleged actions and inaction concerning the June 7 trade. *See* Ans. Br. 58 & n.162.; *see also* Tr. of Oral Arg. ("Tr.") 57, 100 (Mar. 15, 2016).

[12] Compl. Ex. J.

[13] Compl. ¶ 55.

Some internal Company emails produced to plaintiffs in response to their books and records demands discussed the propriety of the June trades. A June 13 email notification sent to Lululemon's regional managers states that Wilson's recent 10b5-1 sales were "in alignment with the SEC guidelines for these types of stock sales."[14] When Stritzke asked in a June 29 email whether the Company "had an attorney look at the facts surrounding the last trade made under [Wilson's] previous plan,"[15] Erin Nicholas, Lululemon's Director of Legal, responded as follows:

> We haven't had an attorney look into the facts surrounding the last trade made under [Wilson's] plan. We were advised that the trade was made pursuant to the parameters of the plan by his advisors and assisted with the drafting of the Form 4 for that transaction.[16]

The record does not reveal how Company representatives arrived at the position that the June 7 trade followed the Trading Plan's parameters.

### D.  Litigation Preceding this Action

In 2013, several lawsuits were filed concerning, among other things, Wilson's trading activity and the Company's public disclosures about the subject.

---

[14] Compl. Ex. N.

[15] *Id.*

[16] Compl. Ex. M.

### 1. The New York Securities Action

On June 2, 2013, a class action was filed in the United States District Court for the Southern District of New York in which the plaintiffs challenged certain public disclosures Lululemon had made about the quality of its products and the nature of its response to then-existing quality-control issues as materially false and misleading under the federal securities laws.[17] The class action plaintiffs argued that scienter was present on the theory that the "suspicious timing and amounts" of Wilson's January-June stock sales evidenced an intent to deceive through the Company's public statements.[18] The Court rejected that argument, finding that the trades were not sufficiently suspicious to justify an inference of scienter because no allegations showed either that Wilson had non-public information about Lululemon's quality control issues or that he had violated the Trading Plan.[19]

### 2. The New York Derivative Action

On August 12 and 23, 2013, two Lululemon stockholders not involved in this action (the "NY plaintiffs") filed derivative complaints in the United States District Court for the Southern District of New York. The actions were

---

[17] *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 561-62 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x. 62 (2d Cir. 2015) (involving claims under Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 thereunder).

[18] *Id.* at 584-85.

[19] *Id.* at 585-86.

consolidated (as defined above, the "NY Action") and an amended complaint was filed on January 17, 2014. It named as defendants the same eleven individuals who are defendants in this action and two additional executive officers of Lululemon: John E. Currie and Sheree Waterson. The amended complaint contained seven claims. One of the claims asserted against Wilson was a *Brophy* claim for breach of fiduciary duty for allegedly selling shares while in the possession of non-public information concerning Day's imminent announcement of her resignation as CEO.[20]

In March 2014, the Delaware plaintiffs sought to intervene in the NY Action for the purpose of asking the district court to grant a limited stay of that action pending the resolution of actions they each had commenced under 8 *Del. C.* § 220 to obtain books and records from the Company or, alternatively, to make any dismissal of the *Brophy* claim in the NY Action without prejudice.[21] In their

---

[20] Transmittal Aff. of Bradley R. Aronstam ("Aronstam Aff.") Ex. 9 (Verified Amended Shareholder Derivative Complaint, *Canty v. Day* ("*Canty* Compl.")) ¶¶ 220-24. The other claims were for (1) violation of Section 14(a) of the Securities Exchange Act and Rule 14a-9 thereunder based on certain statements in the Company's 2013 proxy statement, (2) breach of fiduciary duty for disclosure violations, (3) breach of fiduciary duty for failing to maintain internal controls, (4) unjust enrichment, (5) abuse of control, and (6) gross mismanagement. *Id.* at ¶¶ 209-33.

[21] Aronstam Aff. Ex. 17 (Memorandum in Support of the Laborers' District Council Construction Industry Pension Fund's Motion to Intervene) at 1.

intervention papers, the Delaware plaintiffs characterized the *Brophy* claim in the NY Action as "virtually identical" to a potential claim they were investigating.[22]

On April 9, 2014, the district court issued an opinion granting defendants' motion to dismiss the amended complaint "because plaintiffs have failed to adequately allege particularized facts showing demand on lululemon's Board of Directors was excused."[23] The district court's analysis of the demand futility issue is discussed below in addressing the preclusive effect of that ruling. On April 3, 2015, the Second Circuit affirmed the district court's ruling.[24]

### 3. The Books and Records Actions

In May and October 2013, the two plaintiffs in this action commenced separate actions against Lululemon in the Court of Chancery seeking various corporate books and records under 8 *Del. C.* § 220, including documents relating to the Trading Plan, and Wilson's January, May, and June 2013 stock sales. On April 2, 2014, after trial had been held before Vice Chancellor Parsons in one of the actions, the Court largely denied plaintiffs' requests.[25]

---

[22] *Id.* at 6.

[23] *Canty v. Day*, 13 F. Supp. 3d 333, 350 (S.D.N.Y. 2014), *aff'd*, 599 Fed. App'x 20 (2d Cir. 2015).

[24] *Canty v. Day*, 599 Fed. App'x 20 (2d Cir. 2015).

[25] *See In re Lululemon Athletica Inc. 220 Litig.*, C.A. No. 9039-VCP, at 4-5, 17-32 (Del. Ch. Apr. 2, 2014) (TRANSCRIPT).

13

Vice Chancellor Parsons first found that the circumstances surrounding the January 10-14, May 10-21, and June 4 trades did not provide a credible basis to infer that Wilson had engaged in wrongful conduct.[26] The Court then found that "there are enough questionable features about the nearly-perfectly-timed June 7 trade . . . to conclude that there is a credible basis for suspecting wrongdoing as to that trade," including that: (1) the sales happened the same day that Day notified the board of her resignation, (2) the June 7 sales were significantly larger than previous sales, and (3) only one million shares could be sold in total in June, meaning that the June 7 sales exhausted Wilson's monthly allotment.[27] The Court concluded that inspection of certain books and records was warranted but noted that the proceedings were at a "very preliminary stage" and that the terms of the Trading Plan "ultimately may exculpate Wilson of any wrongdoing."[28]

After the Court's ruling, Lululemon produced certain documents to plaintiffs on April 16, 2014, but withheld others based on attorney-client privilege. On June 11, 2014, the separate Section 220 cases were consolidated. Shortly thereafter, plaintiffs filed a motion seeking the production of the remaining responsive

---

[26] *Id.* at 17-25.

[27] *Id.* at 26-32.

[28] *Id.* at 28-29.

documents. In a memorandum opinion issued April 30, 2015,[29] the Court granted the motion in part. On May 7, 2015, Lululemon produced additional documents.

## E. Procedural History

On July 15, 2015, plaintiffs filed the Complaint, alleging that Wilson's June 7 trading activity was suspicious because (1) it represented the largest volume of shares Merrill Lynch sold in a single day under the Trading Plan, and (2) it occurred one trading day before the Company released market-moving information concerning Day's resignation as CEO of the Company that Wilson knew about before Merrill Lynch made the June 7 trade. The Complaint contains two claims. In Count I, plaintiffs assert that the individual defendants breached their fiduciary duties of loyalty and good faith by failing to investigate Wilson's trading activity. In Count II, plaintiffs assert a *Brophy* claim against Wilson for breaching his fiduciary duties by using material non-public information to execute or influence stock sales for his personal financial gain.

On August 18, 2015, defendants moved to dismiss the Complaint under Court of Chancery Rules 23.1 and 12(b)(6). After the completion of briefing, the Court heard oral argument on March 15, 2016.

---

[29] *In re Lululemon Athletica Inc. 220 Litig.*, 2015 WL 1957196 (Del. Ch. Apr. 30, 2015).

15

## II.  LEGAL ANALYSIS

All defendants moved to dismiss the Complaint on two grounds:  (1) that the Court's finding in the NY Action that demand was not excused precludes re-litigation of the issue in this action under principles of issue and claim preclusion, and (2) that even if re-litigation of the issue were not barred, plaintiffs have failed under Court of Chancery Rule 23.1 to allege particularized facts to show that it would be futile to make a demand on the Company's board to initiate litigation.  In addition, Wilson separately moved to dismiss the *Brophy* claim under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief.  Because the entire Complaint will be dismissed on preclusion grounds, I do not reach the other issues.

### A.  Legal Standard

"In considering a motion to dismiss under Chancery Court Rule 23.1 for failure to make a presuit demand, as is true in the case of a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court confines its attention to the face of the complaint."[30]  Because "strict application of this rule would deprive defendants of the ability to argue for preclusion if, for example, a plaintiff does not plead facts regarding the potentially preclusive litigation or incorporate documents from that litigation into the complaint, . . . 'it is axiomatic that a court must still consider the

---

[30] *White v. Panic*, 793 A.2d 356, 363 (Del. Ch. 2000), *aff'd*, 783 A.2d 543 (Del. 2001).

prior adjudication in order to determine whether issue preclusion bars that plaintiff's claims.'" [31]

Defendants argue that the Complaint is barred under principles of issue and claim preclusion based on the decision in the NY Action. "[T]he United States Supreme Court has held that a state court is required to give a federal judgment the same force and effect as it would be given under the preclusion law of the state in which the federal court is sitting."[32] Here, that state is New York. New York law thus governs the preclusive effect of the district court's dismissal of the state law claims in the NY Action. The parties agree on this choice of law.[33] There is "no significant difference between New York's preclusion law and federal preclusion law . . . ."[34]

---

[31] *In re Wal-Mart Stores, Inc. Del. Deriv. Litig.*, 2016 WL 2908344, at *8 (Del. Ch. May 13, 2016) (quoting *M & M Stone Co. v. Pennsylvania*, 388 F. App'x 156, 162 (3d Cir. 2010)).

[32] *Pyott v. La. Mun. Police Emps.' Ret. Sys.*, 74 A.3d 612, 615-16 (Del. 2013) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001)).

[33] *See* Defs.' Op. Br. 24-25; Pls.' Ans. Br. 23-34.

[34] *Poventud v. City of N.Y.*, 750 F.3d 121, 157 n.5 (2d Cir. 2014) (quoting *Pike v. Freeman*, 266 F.3d 78, 90 n.14 (2d Cir. 2001)).

**B.     Plaintiffs' Claims are Barred by Issue Preclusion**

Issue preclusion (or collateral estoppel) is an equitable doctrine that "applies to prohibit re-litigation of factual issues previously adjudicated."[35]  It is rooted in concepts of fairness that disfavor allowing a party that litigated and lost an issue to litigate the same issue again—or, more colorfully, to take "another whack at the piñata."[36]  Under New York law, "only two requirements must be satisfied" to invoke issue preclusion against "a party, or one in privity with a party," who seeks "to relitigate an issue decided against it:"

> First, the party seeking the benefit of collateral estoppel must prove that the identical issue was necessarily decided in the prior action and is decisive in the present action.  Second, the party to be precluded from relitigating an issue must have had a full and fair opportunity to contest the prior determination.  The burden is on the party attempting to defeat the application of collateral estoppel to establish the absence of a full and fair opportunity to litigate.[37]

Plaintiffs do not dispute that privity exists here,[38] but they do contest that the other requirements of issue preclusion under New York law have been satisfied.

---

[35] *Asbestos Workers Local 42 Pension Fund v. Bammann*, 2015 WL 2455469, at *15 (Del. Ch. May 21, 2015) (applying New York law); *see also Levin ex rel. Tyco Int'l Ltd. v. Kozlowski*, 831 N.Y.S.2d 354 (TABLE), 2006 WL 3317048, at *7 (N.Y. Sup. Ct. Nov. 14, 2006), *aff'd*, 846 N.Y.S.2d 37 (N.Y. App. Div. 2007); *D'Arata v. N.Y. Cent. Mut. Fire Ins. Co.*, 564 N.E.2d 634, 636 (N.Y. 1990).

[36] *Bammann*, 2015 WL 2455469, at *19; *see also Levin*, 2006 WL 3317048, at *7.

[37] *D'Arata*, 564 N.E.2d at 636.

[38] Tr. 67.

18

Thus, the two issues that require decision are whether the district court in the NY Action decided the same demand futility issue that is decisive here and, if so, whether plaintiffs were deprived of a full and fair opportunity to contest that prior determination. Those issues are addressed below.

### 1. Identity of Issues

Plaintiffs allege that the Demand Board disregarded a number of red flags concerning Wilson's June 7 stock sales that "pointed to Wilson having access to and potentially using material non-public information for his own personal financial gain."[39] From this premise, plaintiffs assert that demand is futile on the theory that the members of the Demand Board are not independent because they "consciously shirked their obligation to investigate Wilson's suspicious stock sales" and thus face a substantial likelihood of liability.[40] The district court in the NY Action considered and decided the same issue.

Specifically, the NY plaintiffs argued that demand was excused because Lululemon's outside directors "failed to take any punitive action toward Wilson after learning of his June 2013 trading, and that this failure shows both domination and control by Wilson and a substantial likelihood of liability for these Director

---

[39] Compl. ¶ 71.

[40] *Id.* at ¶¶ 67, 70-72.

Defendants" so as to cast reasonable doubt on their independence.[41] The district court expressly rejected "both formulations" of the NY plaintiffs' challenges to the independence of the Company's outside directors.[42]

The district court, which referred to the eight members of the Demand Board as the "Director Defendants,"[43] first concluded that the NY plaintiffs failed to overcome the presumption of directorial independence concerning any of the Director Defendants on a theory of domination and control by Wilson:

> Plaintiffs fail to plead particularized allegations as to the disinterestedness or independence of *any* of the Director Defendants as it relates to Wilson and his June 2013 trading. Plaintiffs primarily rely on the argument that Wilson allegedly engaged in insider trading prior to Day's resignation announcement on June 10, 2013, that the Director Defendants knew it at that time or very shortly thereafter, and by doing nothing, demonstrated their lack of independence. The allegations in the Amended Complaint do not support this story or the inferences plaintiffs urge this Court to make.
>
> First, though plaintiffs allege that the Director Defendants knew of Day's resignation no later than June 7, 2013, they do not allege any facts as to the Director Defendants' knowledge of Wilson's trading during the period June 4-7, 2013. Second, though plaintiffs allege that Wilson's stock sales were made pursuant to a trading plan that was executed in December 2012 and permitted stock sales on a semi-regular basis, they do not allege any facts that show Wilson's trading

---

[41] *Canty*, 13 F. Supp. 3d at 336.

[42] *Id.*

[43] The district court also included within the definition of "Director Defendants" one additional director, Stritzke, who was still a director of Lululemon when the NY Action was filed. *Id.* at 339.

was inconsistent with that plan. Third, though plaintiffs allege that both Wilson's trading and the fact that he had a trading plan were public knowledge, they do not allege any facts that tend to show that the Director Defendants knew Wilson's trading was inconsistent with that plan.

Instead, plaintiffs ask this Court to infer that the Director Defendants were under such domination and control by Wilson that they deliberately exposed themselves to the risk of individual liability related to Wilson's June 2013 trading, which they believed to be improper, rather than resigning from the Board. Though Wilson may have exercised significant influence over the Board and the company's culture, there are no particularized allegations in the Amended Complaint that credibly suggest such a conclusion.

* * * * *

In sum, plaintiffs' allegations concerning Wilson's stock sales, as they relate to the Director Defendants, are general and conclusory rather than factual and specific, and thus fail to overcome the presumption of directorial independence and to excuse demand. [44]

Later in its opinion, the district court confirmed that its conclusion that the NY plaintiffs had failed to adequately allege that any of the Director Defendants were not independent was not just based on a theory of domination and control by Wilson, but also was based on the their failure "to plead particularized allegations giving rise to a substantial likelihood of liability as to any of the Director Defendants arising out of Wilson's June 2013 trading."[45] On appeal, the Second

---

[44] *Id.* at 346-47.

[45] *Id.* at 349 n.12. In a heading in their brief, plaintiffs further asserted that the "decision not to investigate Wilson's June 7 trades" was not "necessarily decided" in the Derivative Action. Pls.' Ans. Br. 25. Plaintiffs provided no explanation in their brief to support this assertion and thus waived the argument. *See Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ("It is settled Delaware law that a party

21

Circuit affirmed the district court's rejection of both theories that the NY plaintiffs had advanced to challenge the Director Defendants' independence.[46]

Plaintiffs here do not confront the express language of the district court's decision rejecting the NY plaintiffs' challenges to the Demand Board's independence. Instead, they argue that issue preclusion should not apply because the "allegations" in the NY Action are not identical to the allegations in this action. Plaintiffs assert that the NY plaintiffs "devoted over *fifty* pages in their amended complaint to allegations concerning alleged false statements relating to quality control problems and the Luon pant sheering scandal, while merely devoting *one* page to allegations regarding issues related to Wilson's stock sales."[47] Plaintiffs

---

waives an argument by not including it in its brief."). Given the discussion in the district court's opinion quoted above, moreover, it is plain that the district court necessarily decided that demand was futile with respect to the outside directors' failure to investigate Wilson's June 7 trade based on both a "domination and control" theory and a "substantial likelihood of liability" theory in order to address the arguments the NY plaintiffs asserted based on both of those theories. *See Ryan v. N.Y. Tel. Co.*, 467 N.E.2d 487, 490 (N.Y. 1984) ("Of course, the issue must have been material to the first action or proceeding and essential to the decision rendered therein.").

[46] *Canty*, 599 Fed. App'x. at 22. Although appellate briefing in the NY Action challenged the independence of the entire board, the Second Circuit's analysis focused specifically on the independence of the members of the Audit Committee. *See* Aronstam Aff. Ex. 11 (Brief for Plaintiff-Appellant) at 29.

[47] Pls.' Ans. Br. 26.

cite for support the decisions in *Brautigam v. Blankfein*[48] and *Bader v. Goldman Sachs Group, Inc.*[49]

Accepting for the sake of argument plaintiffs' characterization of the amended complaint in the NY Action, the fact that it contained additional allegations concerning other claims is irrelevant. All that is relevant is whether the district court necessarily decided the same demand futility issue presented here, which it did for the reasons explained above. The fact that the amended complaint may have contained fewer factual details concerning the theory of demand futility presented here, moreover, misconceives the test for issue preclusion.

A leading New York commercial litigation treatise states that claims "grounded on the same gravamen of the wrong upon which the action is brought" preclude "the plaintiff from raising the prior cause of action in the guise of a new legal theory or claim."[50] This rule applies "even if there are variations in the facts alleged."[51] This Court similarly explained in a recent case applying New York law to preclude re-litigation of the issue of demand futility that "the underlying conduct

---

[48] 8 F. Supp. 3d 395 (S.D.N.Y. 2014), *aff'd sub nom. Brautigam v. Dahlback*, 598 F. App'x 53 (2d Cir. 2015).

[49] 455 F.App'x 8 (2d Cir. 2011).

[50] Robert L. Haig, *Commercial Litigation in New York State Courts* § 93:3 (4th ed. 4C West's N.Y. Prac. Series 2015).

[51] *Id.*

23

is what is at issue, not whether the Complaint raises additional facts, or a more compelling characterization of those facts, regarding the same conduct previously at issue."[52]   "To hold otherwise would mean that issue preclusion would almost never apply—subsequent plaintiffs could simply add more allegations (or more specific allegations) of corporate malfeasance, and then claim there was no identity of the issues."[53]

As explained above, the district court determined that demand was not futile by looking at the same underlying conduct that forms the basis of plaintiffs' attack on the independence of the Demand Board here:  the failure to do anything to investigate Wilson's June 7 stock sales when the outside directors allegedly knew that Wilson had engaged in insider trading.  As the district court framed the issue, "[p]laintiffs primarily rely on the argument that Wilson allegedly engaged in insider trading prior to Day's resignation announcement on June 10, 2013, that the Director Defendants knew it at that time or very shortly thereafter, and by doing nothing, demonstrated their lack of independence."[54]   As explained above, the district court specifically rejected this argument on both "formulations" that the NY plaintiffs advanced to challenge the independence of the outside directors.

---

[52] *Bammann*, 2015 WL 2455469, at *18 (precluding re-litigation of demand futility).

[53] *Arduini v. Hart*, 774 F.3d 622, 630 (9th Cir. 2014).

[54] *Canty*, 13 F. Supp. 3d at 346.

It is of no moment that the breach of fiduciary duty claim plaintiffs assert here (Count I) is different from the one that was asserted in the NY Action. The *Brophy* claim (Count II) plaintiffs assert in this action is the substantively the same as the one asserted in the NY Action. More significantly, plaintiffs have advanced the same theory of demand futility with respect to both of their claims in this action, *i.e.*, that the members of the Demand Board are not independent because they face a substantial likelihood of liability. As discussed above, the district court rejected that argument and thus decided the same issue that governs the plaintiffs' only theory for challenging the Demand Board's independence in this case.

Finally, I agree with defendants that the *Brautigam* and *Bader* decisions on which plaintiffs rely are inapposite. *Brautigam* held that the challenged conduct was not the same in two cases challenging Goldman Sachs's inclusion of troubled loans in subprime residential mortgage-backed securities. The two cases concerned different collateralized debt obligations involving "factually distinct circumstances which affected the analysis regarding whether demand was excused."[55] *Bader* held that a ruling that demand was required in a case challenging disclosures in a 2007 Goldman proxy statement concerning stock options alleged to have been undervalued did not preclude a challenge to similar

---

[55] *Brautigam*, 8 F. Supp. 3d at 402.

disclosures in a 2008 Goldman proxy statement because the theories supporting demand excusal in the two cases were different.[56]

Here, unlike in *Brautigam*, the same gravamen of wrongdoing underlies the demand futility issue decided in the NY Action and this case, namely the failure to do anything to investigate Wilson's June 2013 stock sales despite the suspicious circumstances surrounding those sales. And, unlike in *Bader*, both the present case and the NY Action assert the same theory challenging the independence of all members of the Demand Board, namely that they face a substantial likelihood of liability for taking no action when they allegedly knew that Wilson had engaged in insider trading.

### 2. Full and Fair Opportunity to Litigate

Because defendants have established that the identical issue of demand futility raised here was necessarily decided in the NY Action and would be decisive here, the burden shifts to the plaintiffs to demonstrate that they did not have a full and fair opportunity to litigate in the NY Action.

---

[56] *Bader*, 455 Fed. App'x at 9-10. Specifically, the court in the first case held that six directors were not interested because "Goldman supported business or charitable entities with which they were associated" and the court "did not reach" a claim that three directors who received the options were interested because those allegations "only related to a minority of the directors." *Id.* at 9. By contrast, the second case alleged that six of twelve directors "were interested by virtue of having received undervalued stock options," and therefore, unlike in the first case, "the question of whether the receipt of undervalued options renders a director 'interested'" was "dispositive of the demand futility issue." *Id.* at 9-10.

26

Under New York law, analysis of whether a plaintiff had a full and fair opportunity to litigate in a previous action "cannot be reduced to a formula," but rather requires consideration of "the realities of the prior litigation, including the context and other circumstances which may have had the practical effect of discouraging or deterring a party from fully litigating the determination which is now asserted against him."[57]  One of the realities of the prior litigation here is that the Delaware plaintiffs moved to intervene in that action and made arguments to the district court in an effort to prevent it from adjudicating a motion to dismiss in a manner that could impede their ability to pursue their claims in Delaware after obtaining books and records from the Company.  Thus, plaintiffs had the opportunity to present their views to the district court, including their views concerning the desirability of obtaining books and records before pressing derivative claims.  As I read the district court's opinion, however, it declined to afford plaintiffs the opportunity to re-plead demand futility.[58]

The other reality bearing on the prior litigation is that it is well-established under New York law (as plaintiffs concede) that privity exists between different stockholders of a corporation in derivative actions for purposes of preclusion:

---

[57] *Ryan*, 467 N.E.2d at 491 (internal quotation marks and ellipses omitted).

[58] *See infra*. section II.C.1.

. . . in derivative suits, shareholder plaintiffs are treated like equal and effectively interchangeable members of a class action because their claims belong to and are brought on behalf of the corporation, rather than on behalf of themselves . . . . As a result, prior legal determinations in derivative suits can bind all other similarly situated plaintiffs who might bring subsequent derivative claims, thus avoiding wasteful and duplicative litigation.[59]

Faced with this reality, plaintiffs argue that the NY Action should not have preclusive effect on the theory that the NY plaintiffs were not adequate representatives of the Lululemon stockholders.

Section 42 of the Restatement (Second) of Judgments, on which the NY plaintiffs rely and which New York courts have followed in considering adequacy of representation,[60] outlines certain scenarios in which a person will not be bound by a judgment. The scenario plaintiffs invoke here is whether "[t]he representative failed to prosecute or defend the action with due diligence and reasonable prudence, and the opposing party was on notice of facts making the failure apparent."[61] Elaborating on this scenario, a comment in the Restatement distinguishes between imperfect legal strategies, which would not warrant a

---

[59] *Levin*, 2006 WL 3317048, at *10, *quoted in Bammann*, 2015 WL 2455469, at *16. This rule represents the clear weight of authority nationally. *See Wal-Mart*, 2016 WL 2908344, at *13 n.69 (surveying decisions).

[60] *See, e.g.*, *Henik ex rel LaBranche & Co. v. Labranche*, 433 F. Supp. 2d at 381; *Algie v. RCA Global Commc'ns, Inc.*, 891 F. Supp. 839, 852 (S.D.N.Y. Apr. 12, 1994); *Univ. Club v. City of N.Y.*, 655 F. Supp. 1323, 1327 (S.D.N.Y. 1987).

[61] *Restatement (Second) of Judgments* § 42(1)(e).

finding of inadequacy, and "grossly deficient" management of the litigation that would be apparent to the opposing party so as to undermine that party's reliance on the prior adjudication:

> The failure of a representative to invoke all possible legal theories or to develop all possible resources of proof does not make his representation legally ineffective, any more than such circumstances overcome the binding effect of a judgment on a party himself. . . . Where the representative's management of the litigation is so grossly deficient as to be apparent to the opposing party, it likewise creates no justifiable reliance interest in the adjudication on the part of the opposing party. Tactical mistakes or negligence on the part of the representative are not as such sufficient to render the judgment vulnerable.[62]

Generally, "[r]epresentatives have been found inadequate when their interests are directly opposed to the interests of the person being represented, which in this case is" the Company.[63]

Here, plaintiffs base their inadequacy argument on three factual contentions: (1) the NY plaintiffs' failure to utilize 8 *Del. C.* § 220 to seek books and records from Lululemon before filing suit, (2) their opposition to the Delaware plaintiffs' efforts to intervene in the NY Action, and (3) their copying of approximately 100 paragraphs of allegations from a securities class action challenging Lululemon's public disclosures when they amended their complaint in the NY Action. Each of

---

[62] *Id.* § 42 cmt. f.

[63] *Wal-Mart*, 2016 WL 290834, at *19 (citing *Hansberry v. Lee*, 311 U.S. 32, 44-46 (1940); *Hoxworth v. Blinder*, 74 F.3d 205, 208 (10th Cir. 1996)).

29

these contentions is, unfortunately, reflective of undesirable practices that pervade representative litigation as lawyers for stockholders jockey for control of a case in an effort to secure a payday for themselves, assuming they ultimately can confer a benefit upon the stockholders or the corporation.

Plaintiffs' third contention concerning the copying of allegations from another pleading, if true, reflects poorly on how counsel for the NY plaintiffs litigated their case. But no explanation has been provided as to how the copying of any of these allegations substantively impacted their litigation of the demand futility issues so as to call into question the legitimacy of district court's determination of that issue or the defendants' reliance on that determination.

Plaintiffs' first and second contentions go hand-in-hand. Despite repeated admonitions of this Court to inspect a corporation's books and records before launching derivative claims,[64] the NY plaintiffs eschewed that route and, relatedly, opposed the intervention motion so that they could move forward with their case before plaintiffs' counsel in Delaware could complete their inspection of the Company's records and pursue the *Brophy* claim themselves.

---

[64] *See, e.g.*, *King v. Verifone Hldgs., Inc.*, 12 A.3d 1140, 1145 (Del. 2011) ("Delaware courts have strongly encouraged stockholder-plaintiffs to utilize Section 220 before filing a derivative action, in order to satisfy the heightened demand futility requirements of Court of Chancery Rule 23.1").

In the *Pyott* case, the Delaware Supreme Court rejected a "'fast-filer' irrebuttable presumption of inadequacy" for "derivative plaintiffs who file their complaints without seeking books and records, very shortly after the announcement of a 'corporate trauma.'"[65] Instead, a plaintiff must point to facts of record under the circumstances of a particular case to support a finding of inadequacy.[66] Although *Pyott* was not decided as a matter of New York law, plaintiffs have not cited any authority suggesting that a New York court would conduct a different analysis, and I have no reason to think otherwise.

The NY plaintiffs were represented by six different law firms. No contention has been made that their counsel are not experienced in corporate litigation, even if they did commit plagiarism. Nor have plaintiffs identified any striking differences between the factual allegations that form the basis of the relevant claims asserted in either action. The *Brophy* claims in both actions are virtually identical, as the Delaware plaintiffs admitted to the district court,[67] and the fiduciary duty claim asserted here essentially repackages in the form of a claim the core of the NY plaintiffs' demand futility allegations—that the outside

---

[65] *Pyott*, 74 A.3d at 618.

[66] *Id.*

[67] *See supra* note 22 and accompanying text.

directors failed to do anything after supposedly knowing that Wilson had engaged in insider trading. The lack of a substantive difference in the key factual allegations follows from the fact that the NY plaintiffs had access to articles in the media, including the June 12 article in the *Wall Street Journal*, before they filed suit. Those articles provided the crucial details concerning the timing and amount of Wilson's June 7 stock sales relative to the Company's public announcement of Day's resignation that, according to the Delaware plaintiffs, served as a red flag to put the Company's directors on notice of the need to take action against Wilson.[68] In sum, although it is certainly better a practice for stockholder plaintiffs to use "the tools at hand"[69] to thoroughly investigate derivative claims before filing suit, the NY plaintiffs' failure to do so in this case falls, in my view, into the category of an imperfect legal strategy and does not rise to the level of litigation management that was so grossly deficient as to render them inadequate representatives.[70]

---

[68] Compl. ¶¶ 70-74.

[69] *See, e.g., Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 120 (Del. 2006).

[70] I previously cautioned against judging inadequacy based on the contents of documents obtained in response to a Section 220 demand because that approach "encourages hindsight review of conduct that should be judged based on the circumstances as they exist in real time," and because "whether a representative litigated with sufficient diligence necessarily depends on her knowledge and expectations at the time, rather than on what happened later." *Wal-Mart*, 2016 WL 2908344, at *22. For this reason, I will not delve deeply into that subject and note only that some additional information plaintiffs obtained here, such as the details of the Trading Plan, tends to exculpate Wilson and the board, rather than to bolster plaintiffs' theories of liability.

For the reasons explained above, I conclude that the district court decided the same demand futility issue that is decisive here, and that the plaintiffs were adequately represented and had a full and fair opportunity to litigate that issue in the NY Action. Thus, plaintiffs are barred from re-litigating the issue of demand futility in this action under the doctrine of issue preclusion. I consider next whether plaintiffs' claims also are barred under the doctrine of claim preclusion.

## C.    Plaintiffs' Claims are Barred by Claim Preclusion

Under New York law, a party seeking to invoke claim preclusion (or *res judicata*) based on the dismissal of a prior action must demonstrate that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action."[71] As previously discussed, privity is not contested. The parties' arguments thus focus on the first and third requirements.

### 1. Adjudication on the Merits

"Under New York law, the dismissal of a derivative action for failure to plead demand futility is a final judgment on the merits for purposes of res

---

[71] *Monahan v. N.Y. City Dept. of Corrs.*, 214 F.3d 275, 285 (2d Cir. 2000).

33

judicata."[72]  New York law further provides, however, that "a dismissal 'without prejudice' lacks a necessary element of *res judicata*—by its terms such a judgment is not a final determination on the merits."[73]

Focusing on one sentence in the district court's opinion, plaintiffs argue that the NY Action was dismissed without prejudice and thus may not be granted preclusive effect here.  The operative sentence, emphasized below, appears in the following paragraph of the conclusion of the district court's opinion:

> For the reasons set forth above, defendants' motion to dismiss the Amended Complaint pursuant to Rule 23.1 is GRANTED, because plaintiffs have failed to adequately allege particularized facts showing demand on lululemon's Board of Directors was excused. ***The Court thus DISMISSES the complaint without prejudice, in the event plaintiffs seek to pursue these claims after making a demand on the board.***[74]

In my view, plaintiffs' interpretation misconstrues the plain meaning of this sentence in the context in which it appears.[75]

---

[72] *City of Providence v. Dimon*, 2015 WL 4594150, at *6 (Del. Ch. July 29, 2015) (citing *Henik*, 433 F. Supp. 2d at 379).

[73] *Landau, P.C. v. LaRossa, Mitchell & Ross*, 11 N.Y.3d 8, 13 (N.Y. 2008).

[74] *Canty*, 13 F. Supp. 3d at 350 (emphasis added).

[75] Because I find the language at issue to be unambiguous, I do not consider extrinsic evidence to construe its meaning.  *Cf. Nw. Nat. Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996) ("Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning. . . .  Courts consider extrinsic evidence to interpret the agreement only if there is an ambiguity in the contract.") (citations omitted); *Sci. Applications Int'l. Corp. v. State*, 876 N.Y.S.2d 182, 183 (N.Y. App. Div. 2009) ("A written agreement that is complete, clear and

The first sentence of the quoted paragraph reflects the district court's conclusion that plaintiffs lack standing to assert the derivative claims because they failed to plead facts sufficient to call into question the disinterestedness and independence of the Company's board. In other words, the NY plaintiffs failed to show that demand on the board was excused and, thus, the board retained the prerogative to determine in the first instance whether it would be in the Company's best interests to pursue the derivative claims.[76] With that context in mind, the obvious intent of the second sentence was to leave open the possibility that the plaintiffs could still make a demand on the board to pursue the derivative claims and, if the board refused to do so (either affirmatively or by inaction), the plaintiffs could then seek to initiate litigation if they believed such refusal was wrongful. But what the district court did not leave open was the opportunity for plaintiffs to attempt to re-plead demand futility. Had that been the district court's intention, it simply would have made the dismissal "without prejudice" full stop, without any of the elaboration set forth in the second sentence.[77]

---

unambiguous on its face must be enforced according to the plain meaning of its terms, and extrinsic evidence of the parties' intent may not be considered unless a court first finds that the agreement is ambiguous") (citation and alterations omitted). Plaintiffs agree with this approach. Tr. 71-72.

[76] *See Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[77] Plaintiffs asserted at argument that when the district court used the word "plaintiffs" it was referring only "to those two plaintiffs in the derivative action" (*i.e.,* Thomas Canty and Tammy M. Federman) and not to any other stockholder of the Company. Tr. 69.

This reading is consistent with how courts in Delaware and New York have construed similar statements in New York decisions dismissing claims for failure to establish demand futility. In *Bammann*, for example, Vice Chancellor Glasscock considered the effect of a New York state court decision dismissing a complaint for failure to plead demand futility where the dismissal was "without prejudice for the Plaintiff to replead, if they are so advised, with respect to making a demand subsequent to this day."[78] Vice Chancellor Glasscock found that, "[o]f course, though the dismissal was without prejudice to replead upon making demand, the Plaintiff, either here or in that case, would not be able to replead the *demand futility* issue."[79] Similarly, in *Henik*, the United States District Court for the Southern District of New York considered the effect of another New York state court decision in which the action "was 'dismissed without prejudice to the bringing of a new action, if a pre-suit demand is either rejected or not considered within a reasonable amount of time.'"[80] The court concluded that "[b]y

That may be true, but that by itself does not mean that the district court's rulings would not have preclusive effect on other stockholders of the Company. To the contrary, it is well-established under New York law, and conceded by plaintiffs, that privity exists in derivative actions between different stockholders of a corporation. *See supra*. section II.B.2 & note 59.

[78] *Bammann*, 2015 WL 2455469, at *18 n.149.

[79] *Id.*

[80] *Henik*, 433 F. Supp. 2d at 379.

implication, then, the [prior] action ***was dismissed with prejudice*** to the bringing of a new action, absent showing that a pre-suit demand was rejected or not considered."[81]  Here, as well, the necessary implication of the district court's decision in the NY Action is that the dismissal was with prejudice to the ability of the plaintiffs to seek to replead demand futility.[82]

## 2.  Plaintiffs' Claims Were or Could Have Been Raised

The third requirement of claim preclusion under New York law requires that "the claims asserted in the subsequent action were, or could have been, raised in the prior action."[83]  This requirement means that "'once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy.'"[84]  "When alternative theories are available to recover what is

---

[81] *Id.* (emphasis added).

[82] Plaintiffs cite as contrary authority the Second Circuit's decision in *Elfenbein v. Gulf & Western Industries, Inc.*, 590 F.2d 445 (2d Cir. 1978).  There, the court held that language dismissing a case "without prejudice to its renewal" was sufficiently confusing that the court chose "to import no meaning to the phrase beyond the meaning repeatedly given by this court to the phrase 'without prejudice.'"  *Id.* at 449.  Here, by contrast, the operative language in the district court opinion is not ambiguous in my view and leads to only one reasonable interpretation for the reasons discussed above, *i.e.*, that plaintiff may not replead demand futility but may seek to make a demand and thereafter pursue recourse if such a demand is wrongfully refused.

[83] *Monahan,* 214 F.3d at 285.

[84] *In re Hunter*, 827 N.E.2d 269, 274 (N.Y. 2005) (quoting *O'Brien v. City of Syracuse*, 429 N.E.2d 1158, 1159 (N.Y. 1981)), *quoted in City of Providence*, 2015 WL 4594150, at *7.

essentially the same relief for harm arising out of the same or related facts such as would constitute a single 'factual grouping,' the circumstance that the theories involve materially different elements of proof will not justify presenting the claim by two different actions."[85] As a result, to the extent a complaint is filed arising out of the same subject matter as a complaint in a case in which there has been a judgment and "the claims . . . in the new complaint implicate events alleged to have taken place before the filing of the original complaint, res judicata applies."[86]

Plaintiffs argue that the same subject matter requirement of claim preclusion has not been satisfied because the NY plaintiffs "could not have brought the claims asserted in this case because at the time, the necessary facts were not known or knowable absent a successful Section 220 investigation."[87] According to plaintiffs, the NY plaintiffs' case "ended once Wilson filed his Form 4's disclosing the June 7 trades," while "the claims asserted here did not even begin" until the *Wall Street Journal* article was published on June 12, 2013, "raising red flags that Wilson's June trades were conveniently timed and therefore suspicious."[88]

---

[85] *O'Brien*, 429 N.E.2d at 1160.

[86] *UBS Sec. LLC v. Highland Capital Mgmt., L.P.*, 927 N.Y.S.2d 59, 64 (N.Y. App. Div. 2011).

[87] Pls.' Ans. Br. 38.

[88] *Id.* at 38-39.

As a factual matter, plaintiffs are incorrect to suggest that the NY plaintiffs were unaware of or did not have the opportunity to utilize the referenced the *Wall Street Journal* article to advance their claims. That article was published seven months before the amended complaint at issue in the NY Action was filed on January 17, 2014, the article is specifically discussed in that complaint,[89] the district court's opinion cites to those allegations in discussing the allegedly suspicious timing of Wilson's June 2013 trades,[90] and the NY plaintiffs specifically referred to that article and to the "widespread media criticism of Wilson's suspicious trades" generally, in challenging the failure of the Company's board to take any action against Wilson concerning the June 7 trades.[91]

As a legal matter, it cannot legitimately be disputed that the claims at issue here arose out of the same transaction that forms the basis of the claims asserted in the NY Action. Both actions take specific aim at Wilson's June 7 trade. Indeed, both actions assert a *Brophy* claim against Wilson based on his inside knowledge

---

[89] *Canty* Compl. ¶¶ 32, 33, 169, 198.

[90] *Canty*, 13 F. Supp. 3d at 340 (citing *Canty* Compl. ¶¶ 33, 169).

[91] *See* Aronstam Aff. Ex. 11 (Brief for Plaintiff-Appellant) at 3, 34; *see also* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Amended Complaint at 3, *Canty v. Day*, C.A. Nos. 13-CV-5629-KBF & 13-CV-5977-KBF, (S.D.N.Y. Feb. 14, 2014) ("Notably, following: (a) Wilson's stock sales between June 4 and June 7, 2010; and (b) the June 10, 2010 disclosure of Day's resignation, which immediately caused Lululemon's stock price to plummet by $18 per share, or *22%*, the financial media, including the *Wall Street Journal* . . . noticed the highly suspicious timing of those events.").

39

of Day's imminent announcement of her resignation as CEO and, as discussed previously, they both implicate the same issue of demand futility relevant to that claim. Although the Complaint here asserts an additional claim for breach of fiduciary duty on the theory that the board improperly failed to investigate Wilson's trading activity, that claim essentially repackages in the form of a claim the NY plaintiffs' theory for challenging the outside directors' independence for demand futility purposes. Plaintiffs have offered no logical reason why that claim could not have been asserted in the NY Action, and I can conceive of none. Thus, in my opinion, the same subject matter requirement of claim preclusion has been satisfied here.

\* \* \* \* \*

For the reasons explained above, the three requirements of claim preclusion under New York law have been satisfied, and plaintiffs have failed to demonstrate that the NY plaintiffs were not adequate representatives of the Lululemon stockholders. Accordingly, and as an alternative to dismissing the Complaint under the doctrine of issue preclusion, the Complaint is dismissed under the doctrine of claim preclusion.

## III. CONCLUSION

For the foregoing reasons, the Complaint is dismissed in its entirety.

**IT IS SO ORDERED**.

40